ARTHUR S. SHEFFER v. OSCAR H. SCHMIDT, Appellant.—26 S. W. (2d) 592.

Division One, April 2, 1930.

*Stringfellow & Garvey* for appellant.

*Duvall & Boyd* and *Miles Elliott* for respondent.

LINDSAY, C.—This is a suit for damages for personal injury suffered by plaintiff while driving his automobile after dark upon an unfinished part of a state highway. He was driving along a road-

1044

way upon an embankment leading to a bridge which was under construction. The embankment stopped a short distance from the end of the unfinished bridge. In order to avoid running down the unfinished end of the embankment toward the end of the bridge, he steered his car down the side of the embankment and suffered the injury of which he complains. He had driven over the same road a few hours before. In its entirety this is the highway between Hannibal and St. Joseph. The part of it involved in this case was included in a construction project, covering the distance of two and one-fourth miles, and extending westward from the east line of Buchanan County. The road on this project crossed the Third Fork of Platte River. The course of the road near and east of the river, lay along and over low land. The plan as finally projected by the Highway Department provided for a bridge over the river, and also for an overflow bridge in the lowland at a point 600 feet east of the river. The road across the lowland was constructed upon an embankment, which was from three feet to eight feet in height. The date of the occurrence of plaintiff's injury was the 6th day of November, 1924. At that time, the chief unfinished part of the project was the overflow bridge, then nearing completion. This bridge was 160 feet in length from east to west. The grading and fills had been completed, and the concrete laid thereon on each side of the overflow bridge, up to a point within a short distance from the ends of that bridge. The concrete roadway, proper, was eighteen feet wide, with dirt shoulders six feet in width. The work of completing the shoulders was not entirely done. Pending completion of the overflow bridge, the embankments on either side of it were not built quite up to the ends of the bridge, nor had concrete been laid upon the roadway quite up to the ends of the fills, and there was thus a gap at each end of this bridge. The concrete was laid on each side to a point about seventy-five feet or less, from the respective ends of the bridge, and the level tops of the fills extended somewhat farther toward the bridge beyond the ends of the concrete. (The testimony varied as to these distances.) Thence, the ends of the embankment sloped downward toward the respective ends of the bridge. The conditions at the east and west ends, were similar, but it was the east end which plaintiff was approaching on the occasion of his injury. The height of the embankment at the east end was about eight feet. The witnesses varied in their estimates of the length of the slope from the top of the uncompleted fill down to the east end of the bridge. The existence of this gap or opening at the end of the bridge, without any barricade in front of it and with no warning light displayed there at the time plaintiff approached it in his automobile, are the physical conditions complained of by him. During the course of the work of grading and of laying concrete, and pend-

ing the completion of the overflow bridge, and making of a junction between the bridge and the roadway proper, a temporary roadway was used by the contractors and by persons residing within the limits of the project, to go around the overflow bridge; and, there is evidence tending to show that in the period shortly before the plaintiff's injury persons other than local residents, or men employed by the contractors, were using this highway, and passing along this temporary roadway, connecting the two concreted ends. This temporary roadway, from a point near the end of the concrete on the west side of the overflow bridge, ran diagonally down the south slope of the embankment to the level of the ground, and thence east, along the south side of the bridge, and thence diagonally up the embankment, to a point near the end of the concrete on the east side of the bridge.

In the afternoon of the day of plaintiff's injury, accompanied by two men, he drove his car, a Dodge sedan, eastward from St. Joseph, his place of residence, over the roadway included in the project under construction, and in doing so drove over the temporary roadway leading around the bridge, as above described. Returning in the evening after dark, of the same day, he drove over the concrete road on the east of the overflow bridge, at a speed of twenty to twenty-five miles an hour, and up to a point near the gap at the east end of the bridge, and it appears, so near the gap, he realized that at the speed his car was moving, he could not stop the car in time to avoid running down the end of the embankment and against the bridge. He put on the brakes, and at the same time turned the car to the south, and west, down the side of the embankment. The car ran down the embankment and for a short distance over the low ground, the plaintiff with his foot pressing the brake and endeavoring to avoid striking certain bumps or unequal places. The car, however, did strike a bank, and by reason of the concussion against the bank and of the tense position of the plaintiff, he suffered a vertebral fracture, and injuries incidental thereto.

The contract for constructing the concrete pavement on this project was let by the Highway Department to Stanton and Son. It was a part of their contract to build the shoulders, to maintain a detour road around the entire project, to be used until the completion of the project; also, to erect and maintain barricades, detour and warning signs, at places designated by the Highway Department. A detour road around the entire project had been maintained and used, and was being maintained and used during the construction work prior to the time of plaintiff's injury, and until afterward. The contract for the grading, and construction of culverts and bridges, was let to defendant Schmidt. Defendant sub-let the contract for grading to one Ernest Euler, with the consent of the Highway Department.

Euler did the work of grading, and, under his contract with Schmidt, at the price and rate specified for that work in Schmidt's contract with the Highway Department. Schmidt retained and did the work of construction of culverts and bridges. The construction of the overflow bridge was a work required under a change made by the Highway Department in the original plan, a change which the contract with Schmidt permitted. As a result of this change of plan, and the delay incident thereto, Schmidt did not get the overflow bridge finished in time for the embankment made by Euler to be completed at the ends of that bridge; but, the work of Euler in grading, and of Stanton and Son in laying concrete, was brought up near each end of the bridge, and suspended, pending completion of the bridge.

The plaintiff in his petition alleged that defendant at the time in question was engaged in the work of building the grades and erecting bridges on the project including the overflow bridge, and knew or, in the exercise of ordinary care, should have known the roadway was open to travel and was being used by the public generally for travel; that in the work of building the bridge in question, defendant "caused" the gap or chasm to be left at the end of the bridge, and negligently caused it to be left unbarricaded and unguarded, and failed to maintain any lights or signs of warning at that place.

The answer, after a general denial, pleaded contributory negligence on the part of plaintiff, in that he had traveled over the same road earlier on the same day; knew of the bridge and conditions there, and negligently failed to look for it, and drove his car at a reckless and negligent rate of speed, and failed to keep it under such control as was proper under the circumstances. The answer next pleaded that plaintiff, knowing the condition of the bridge and conditions surrounding it, assumed whatever risk was connected with the use of the road at that place.

At the close of plaintiff's evidence and again at the close of the case, defendant offered an instruction in the nature of a demurrer to the evidence, which was refused. The plaintiff had a verdict and judgment, and defendant appealed.

Upon the appeal defendant insists the court erred in submitting the case to the jury, for the reason that the evidence does not show defendant caused the gap to be left in the roadway; also that Euler, who graded the roadway, was an independent contractor, and that the obligation, if any, to protect the public against the gap in the roadway, did not rest upon defendant, but upon Euler, or Stanton and Son, and the Highway Department. And, it is further insisted that plaintiff assumed the risk, and that he was guilty of contributory negligence, precluding a recovery. Complaint is also made of plaintiff's Instruction 1 covering the case, and also of the refusal of the court to give a series of instructions offered by defendant.

Much space is taken up in the record with testimony concerning the maintenance, or lack, of barricades and detour signs to prevent travelers from passing over the road included in this project and send them along the detour maintained around the entire project, and around some other portions of the uncompleted highway under construction, between St. Joseph and the part of the road included in this project, and evidence tending to show travel by the public over the unfinished highway. Under the view we take of the case, we find it unnecessary to set forth or discuss that testimony. Much space is taken up in the briefs with discussion of the questions whether it was the duty of the defendant, to maintain barricades and warning signs on the roadway included within the project and about the bridge, and to maintain lights or warnings at the bridge in the nighttime, or, whether, as contended by appellant, Euler, the sub-contractor who did the grading and stopped the embankment before reaching the bridge at either end, was the one upon whom such duty was imposed. We do not go into those questions, but proceed upon the theory that under the circumstances shown in the evidence, and the use shown to have been made of the roadway included in the project, by travelers, the leaving of the openings at the ends of the overflow bridge without barricades, and at night, without lights, was negligence; but, that the question whether the plaintiff under the evidence was guilty of contributory negligence is the controlling question, and determinative of this case.

The circumstances under which, on the return trip, plaintiff drove down the side of the embankment at the east end of the overflow bridge and received the injury complained of, were related by the plaintiff himself and his two companions. No one else was present or knew of the manner of the occurrence. There is no material variance in the testimony given by the plaintiff and the testimony given by Mosteller and Wright, the two men who were with him on the trip out in the afternoon, and on the return trip a little after dark. Mosteller sat in the back seat, and Wright on the front seat with plaintiff, and plaintiff drove the car both ways on the trip, until the occurrence of his injury. They all remembered that on the trip out, at about two o'clock in the afternoon, the car had to be driven down the side of the embankment at the west end of the over-flow bridge, and along the low ground south of the bridge and up the embankment east of the bridge, reaching the top at a point near where the concrete began. They drove east over the concrete to its end, a distance of one and three-fourths miles, and thence over a dirt road, by which they finally reached Cameron, the end of their outbound trip, a distance of about twenty-six miles from the over-flow bridge. The distance from the overflow bridge to St. Joseph is about sixteen miles. As just before stated, the concrete from the

east end of the overflow bridge extended one and three-fourths miles to its connection with the dirt road mentioned, but to the minds of the plaintiff and the witnesses named, as they estimated or remembered it, the concrete from the end of the bridge to the dirt road extended about two miles. Mosteller said when they passed the overflow bridge in the afternoon, he saw carpenters at work putting up forms for the barricades (at the sides) of the bridge, and that there was some form lumber piled up on the bridge. Wright said that as they approached the west end of the overflow bridge in the afternoon, the plaintiff stopped his car and they "waited for another car to come through," that is, through by way of the temporary road around the bridge. The plaintiff himself, testifying as to what he saw at the overflow bridge in the afternoon, said: "We noticed that men working on that bridge could be very plainly seen in the daylight; that it was not filled in, and that there was a road that ran down off the side of the bank, and around the bridge and up on the other side, so we followed that around." He said that thence they went over the paved part of the road, and got to the dirt road, and went on eastward. In the evening at about dark on the return trip, having come over the dirt road by which they had gone, they were passing over the concrete toward the east end of the bridge. The plaintiff said the brakes on his car were in good condition; that the lights were the regular lights of a Dodge sedan; that they were in good condition—both lights on, and shining in front of the car. Mosteller and Wright both said the lights "were pretty fair lights . . . shone up the road pretty good . . . lit the road good." They all agreed that the car was moving at a speed of twenty to twenty-five miles an hour over the concrete, and, at the time they came up to the overflow bridge, at least very near it, when plaintiff put on the brakes, and also immediately turned the car to the south, down the embankment. The car went down at a right angle, and not along the temporary roadway.

Mosteller, asked to state what happened, said: "Mr. Sheffer and Wright were in the front seat and of course could see the road better than I could. I saw a black place that looked like it might have been a fill where there was no paving put in. Just about the time I said 'slow down' it all happened, and Mr. Sheffer turned, and down the bank we went and out over into that fill on the side of the road." Asked which way the car was headed when it stopped he said: "It was at right angles to the road. Came right out and went at right angles and upon the bank of that little fill." By that he meant a bank south of the embankment where dirt had been taken out in making the embankment. This witness was asked on cross-examination whether he knew (at the time of the trial) at what point of the road plaintiff turned the car—whether after it left the concrete or

before leaving it. He said: "We came to that end and I think I took particular notice that we could have gone a few feet farther and gone down this little driveway, but we turned just short of that and went down the bank. Q. You turned a little short of the road you came up that afternoon? A. Yes, sir; and I think it was right at the end of the concrete where we turned.—That is, the concrete where it showed." He said the "little road" started a little beyond the concrete, and went down "a gentle slope," diagonally, southwestward. Further on he again said, it seemed to him that plaintiff turned and went at right angles, but the little road did not go down at right angles. When asked whether the end of the concrete was seventy-five feet from the end of the bridge, he said he thought it was at least thirty feet back of the bridge, and that when the car turned he thought it was at least thirty feet back of the bridge. He said: "Whatever the actual distance was, I know we missed the little road and I don't know why Mr. Sheffer did not go down that, whether he attempted to go down that or not, all I know, he did not go down that road and went just east of it."

The witness Wright was asked to tell what first attracted his attention and what happened. He said: "Well, we were just riding along and of a sudden Mr. Sheffer put on his brakes and I just looked and seen the end of this bridge, looked pretty close right in front of us, and suddenly we turned and went off the south side of this approach. . . . When he put on his brakes, we were pretty close you see. You could see the end of the bridge. You could see the end that was not filled in. That was a black place in the road. . . ." Asked how far they were from the bridge when the brakes were put on, he said: "In feet, I would not know how far. We were right there at the end of the pavement, because this place didn't show up very far away, it was so level ground." Mr. Wright said he did not remember when they struck the paved road again on their way back. He said, however: "A fellow always knows when he gets on the paved road from a dirt road. It is generally quite a bit smoother." Asked whether as they rode along he was watching the road ahead, he said: "Not a great deal, no, just riding along with him, talking probably." Further on he said he thought when they went over the side of the embankment, they were thirty-five or forty feet from the end of the bridge and close to the drop of the end of the embankment—"right close to the end of the dirt." The plaintiff said: "We came down the paved concrete along very nicely, I just noticed ahead some distance there was a dark streak on the road, might have been a shadow, might have been a space where there was some dirt on the pavement, which very often there was out there. In fact, on that new road there was considerable dirt thrown up on the pavement at different places." He said also they

were finishing the shoulders at some places as he went along on the outgoing trip. The plaintiff, asked how he drove in approaching the bridge, said: "I was watching the road. The road was very rough and required close attention." Further referring to dirt on the pavement he said: "I thought that is what it was, and when I got nearly to it, close to it, I saw there was a hole there, but was too close for me to stop. I applied the brakes just as quickly as I possibly could. I knew instinctively that I wasn't going to stop before I could go into that hole that was before me, and I turned the car—did what I thought was best—turned it off the side of the road down the embankment, which I could see was not as steep as the one ahead of me and that there was not any pier of the bridge on that side like there was straight ahead of me." The plaintiff said that in coming back he knew there was a bridge somewhere ahead and was expecting that there was a bridge ahead of him, but didn't think it was as close as two miles from the end of the pavement. Plaintiff said that he knew when he reached the end of the concrete coming back, somewhere ahead of him, he had to go around this bridge, but that having seen the bridge in the daytime without a barricade and the men working there, he expected that at night it would be barricaded. Asked on cross-examination about seeing a shadow ahead he said: "I didn't know it was a shadow, or what it was. I saw a dark streak along there and I presumed it might have been a shadow or dirt across there. There was dirt across the paving in a good many places." Of this he said: "There was a difference in color between it and the concrete." He also said: "I went ahead until I observed there was a hole ahead instead of this black streak and when I did I put on my brakes;" that he saw he was too close to stop and turned down the embankment. The floor of the bridge was at a level with the pavement. The plaintiff described it as from the direction in which he was traveling at the time—described it as a pavement that came to an end, then there was the dirt beyond, and the hole or gap between the dirt and the bridge. He said the guard rails of the side of the bridge were possibly two or three feet above the side. The plaintiff in his cross-examination said that he went ahead towards this dark place; that he saw nothing in the road until he realized he was so close to it that he could not stop going ahead, with his brakes. Plaintiff was asked when he saw the dark place that attracted his attention, different in color from the concrete, whether he slowed down; he answered: "I couldn't say." A part of the deposition of plaintiff taken a short time after the accident, was read in evidence by defendant. In the deposition plaintiff testified that he "saw ahead what looked like a shadow in the road;" that "this shadow would show ahead two or three hundred feet," and that "he remembered seeing that shadow when two or three

hundred feet back," and that he "didn't know how close he was to it" when he determined that he had to make the turn, but was so close to it he was afraid to risk the brakes stopping the car.

The plaintiff was traveling on a roadway not completed and which the Highway Department had not formally opened to the public. Defendant's evidence tended to show that the detour signs were maintained at the intersecting crossroads. Plaintiff's evidence tended to show that travelers were in fact going over this roadway. It is a case wherein from the evidence, it appears that some of the public at least were using the road in question by sufferance rather than by invitation, or express permission, of the state authorities or the contractors. We mention this, but do not regard it as of controlling importance, for the reason that the plaintiff at the time of his injury was not going over the roadway for the first time, and he knew it was unfinished. He knew it would be necessary for him to do the very thing which he undertook to do, that is, go down the side of the embankment on which he was traveling and go around the overflow bridge. Plaintiff's injury was caused by the fact that he did not have his car under control when he drove down the embankment. On that account he was compelled to exert himself to the utmost, pressing the brake, and holding the steering wheel in an attempt to avoid striking the banks and inequalities about the borrow pit at the foot of the embankment, so as not to overturn the car. The car was not overturned or damaged, and plaintiff's companions were not injured, though the passage down the embankment and beyond for some distance was rough. The fracture of a vertebra of plaintiff's back was caused by the force of the concussion of the fore wheels against a bank made by the excavation of dirt, his body being held at the time in a tense position. He says this rendered him helpless and he lost control. The car ran on some distance, Wright says, to a point one hundred feet from the top of the embankment, stopping upon the bank with all the power off.

In Waldmann v. Skrainka Construction Co., 289 Mo. l. c. 633, it is said: "It is settled law in this State that, while a traveler on a public street or sidewalk may ordinarily presume that the way is clear and in good condition, still, if the traveler knows that the sidewalk or street being used by him is torn up or obstructed by public work being done therein, he cannot go forward, relying on the presumption that the way is clear, but must exercise his faculties to see and discover the dangers that he may encounter from such obstructing public work, and if he fails to do so, and is injured thereby, he cannot recover, on the ground that he himself is guilty of contributory negligence, although the public authorities or the contractor doing the work, may also have been guilty of negligence. [Welch v. McGowan, 262 Mo. 709; Wheat v. City of St. Louis, 179 Mo. 572;

Ryan v. Kansas City, 232 Mo. 471; Craine v. Met. St. Ry. Co., 246 Mo. 393; Woodson v. Met. St. Ry. Co., 224 Mo. 685; Kaiser v. St. Louis, 185 Mo. 366; Brady v. St. Joseph, 167 Mo. App. 425; Cohn v. Kansas City, 108 Mo. 387.]'' In that case the plaintiff was walking upon a public street in the city of St. Louis. However, the rule there stated, in its general terms, is applicable to the plaintiff under the facts in the instant case. The authorities bear out the contention made on behalf of plaintiff that the mere fact a traveler may have previous knowledge or notice of a defect in a highway does not conclusively establish contributory negligence on his part, and also, that travelers have a right to use a defective highway under certain circumstances, and that in cases of injury the question whether the plaintiff exercised reasonable care for his own safety is ordinarily a question for the jury. [13 R. C. L., Highways, secs. 387, 433, 434; 29 C. J. 700, sec. 463.] We do not think that the obstruction or defect in the roadway here in question and known to plaintiff, was of such a nature as to render its use necessarily dangerous to a person ordinarily careful, or such that an ordinarily prudent person would not have attempted to pass over it in the nighttime in an automobile with good brakes, and headlights in good order. But plaintiff's knowledge required him to exercise the reasonable care of an ordinarily prudent person. Counsel for plaintiff have cited, under the contention that plaintiff was not guilty of contributory negligence, a number of cases. [Megson v. St. Louis, 264 S. W. 15, 23; Maus v. Springfield, 101 Mo. 613, 618; Graney v. St. Louis, 141 Mo. 180; Kieffer v. St. Joseph, 243 S. W. 104; Heberling v. Warrensburg, 204 Mo. 604, 619; Fischer v. St. Louis, 189 Mo. 567; Loewer v. Sedalia, 77 Mo. 431.] These in the main are cases wherein the person injured was traveling on foot. Some of the courts have announced the rule that it is negligence as a matter of law, to drive an automobile at such a rate of speed that it cannot be stopped to avoid an obstruction, discernible within the driver's length of vision ahead of him. Cases of this character are cited in the annotation to be found in 44 A. L. R. 1403. Among them is Solomon v. Duncan, 194 Mo. App. 517, a case wherein the plaintiff, at night, drove his automobile against an obstruction in the street of which it appears he had no knowledge prior to that time. In Ross v. Hoffman, 269 S. W. 679, the Kansas City Court of Appeals took a different view from that taken by the St. Louis Court of Appeals, and refused to follow the rule announced in the Solomon case. In the Ross case the plaintiff, about midnight, was driving his automobile with bright headlights at the rate of twenty miles an hour on a public street in Kansas City. Suddenly, within fifteen or twenty feet of his car, and directly in front of it, he saw a pile of lumber and was unable to avoid striking the same. It does not appear that he had any previous notice or knowledge of the fact the lumber was in the street.

In Powell v. Schofield, 15 S. W. (2d) (Springfield Court of Appeals) 876, the plaintiff was driving on a highway at night, and ran against the large motor bus of the defendant which had been stopped on the highway, but with no warning light showing. Before the plaintiff reached the bus, or saw it, a car was approaching him from the opposite direction with very bright lights which plaintiff said blinded him. He turned his own car to the right to avoid the approaching car, and about the time it passed him, saw the bus immediately in front of him and was unable to prevent his own car from striking the bus. There the question discussed was whether plaintiff being blinded by the lights should have stopped his own car. In the opinion in that case the court referred to the Solomon case and the Ross case, and refused to follow the Solomon case. In the case at bar it is not necessary to apply the hard-and-fast rule, even if such a rule were proper, that the driver of an automobile at night must drive at such a rate of speed that it can be stopped, in time to avoid an obstruction discernible within the driver's length of vision ahead of him. The author of the note in 44 A. L. R. 1403, expresses the opinion that the rule is too broad, and the duty should be limited to the observation of conditions which the driver of the car should reasonably anticipate. On the return trip from Cameron over the same dirt road which he had traveled on the outgoing trip, plaintiff came to the paving east of the overflow bridge. He did not know the exact distance from the east end of the paving to the bridge, but he says he knew it was short compared to the dirt road over which he had just passed, and he says he knew that in traveling over this paving he would come to the gap at the bridge, and have to go around, by driving down the side of the embankment. Nevertheless, he drove over this short stretch of paving, actually only one and three-fourths miles in length, at a speed of from twenty to twenty-five miles an hour, and according to his testimony and that of his companions, he did not attempt to check that speed, until the time when he saw he was so close to the bridge that he could not stop his car in time to prevent going down the end of the embankment, suddenly put on his brake, and immediately turned his car south down the side of the embankment. The testimony of plaintiff and his companions is, that the headlights of the car were shining in front, and giving a good light upon the road. Mosteller, from the rear seat, "saw a black place that looked like it might have been a fill where there was no paving put in," and he says that just about the time he said "slow down," it all happened. The plaintiff in the statement made by him in his deposition read in evidence, and not further explained by him, spoke of what he saw two or three hundred feet ahead by the light of the lamps, which he said looked like a shadow in the road. In his testimony on the trial he said he did not know

it was a shadow, or what it was; that he saw a dark streak across there, and presumed it might have been a shadow, or more dirt across the pavement; that he saw a dark place different in color between it and the concrete, but, when asked the direct question, whether when he saw it he slowed down or not, said he "couldn't say." He says he went ahead until he observed there was a hole ahead instead of a black streak, and when he saw that, he put on the brakes.

Counsel for plaintiff, among the cases cited, stress somewhat the rule as laid down in Megson v. St. Louis, 264 S. W. l. c. 23. The plaintiff in that case was on foot, and stepped upon a part of a sidewalk which covered an areaway. The plates and supports on that side of the walk had corroded, and gave way under him. It was noted in the opinion, at page 22, that the plaintiff, before the occasion of his injury, had casually noticed signs of corrosion and decay in the plates and supports of the walk. It was held, however, that he was not guilty of contributory negligence as a matter of law. This holding was made upon the theory that while one in his situation might have observed signs of decay in the walk, he yet might be wholly ignorant of the extent of the ravages of the elements upon its supported parts, and "absolutely ignorant of the danger lurking behind such defects." In the instant case the plaintiff knew that this stretch of concrete was short, compared with the dirt road over which he had just passed. He knew, as a matter of absolute fact, that it came to a rather abrupt end, and that he would be obliged to drive down the side of the embankment to the low ground below, and he was expecting to do that; yet, he did not so control the speed of his car, that when he saw the detour down the side of the embankment was necessary, he could control the speed of the car in going down the embankment, and its movement over the ground below. Under the circumstances shown by the testimony for the plaintiff, we are driven to the conclusion that he failed to exercise ordinary care for his own safety; that his own negligence directly tended to cause his injury and that the judgment herein must be reversed. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by Lindsay, C., is adopted as the opinion of the court. All of the judges concur.