GEORGE BARANOVIC v. C. A. MORENO COMPANY and CITY OF ST. LOUIS, Appellants.—114 S. W. (2d) 1043.

Division One, April 1, 1938.

*E. H. Wayman* and *Louis A. McKeown* for City of St. Louis.

*Green, Henry & Remmers* for C. A. Moreno Company.

*Francis Kane, Frank A. Wesley* and *Earl M. Pirkey* for respondent.

324

HYDE, C.—This case, recently reassigned to the writer, is an action for damages for personal injuries. Plaintiff obtained a verdict for $25,000 against both defendants. The trial court ordered a *remittitur* of $7500 which was made, and judgment was entered for $17,500. Both defendants have appealed from this judgment.

Both defendants (hereinafter referred to as City and Moreno) contend that the court should have directed a verdict against plaintiff because he was guilty of contributory negligence as a matter of law. Plaintiff was injured when his automobile ran against a barricade in the center of Gravois Avenue in St. Louis on December 9, 1931. At that time, the pavement on Gravois (running southwest to northeast) was being widened and reconstructed. This work had been going on for some months and some parts of the street were entirely completed. Between Jefferson Avenue and Arsenal Street, a distance of seven blocks, the city had completed a pavement (with a concrete base and asphalt surface) twenty-nine feet wide on the south side of the street. The pavement on the north side had not been opened for traffic. In the center portion seventeen feet wide, where the street car tracks had been, Moreno was "putting in macadam and cinders as a temporary paving." This part of the street was only opened that day, and "Gravois wasn't made then from Thirteenth Street to Jefferson." From Jefferson to Arsenal, on each side of the center strip, Moreno had constructed a barricade. This was built with two by eight boards fourteen to sixteen feet long. "Some of those boards extended from one A-frame to the other, and some, the end rested on the ground (and) extended up over the cross-pieces . . . above the surface of the ground . . . about three feet; (these) pointed to the southwest. . . . They were in an even line" (according to plaintiff's witness Gundlach, a former city engineer who said he inspected them "once a day at least, and sometimes twice a day"). This witness also said: "I didn't visit the job at nighttime, but I knew the lights were there; I visited the work once or twice at night and saw lights burning."

.Plaintiff was a motor mechanic ,and an experienced driver. On the night of the accident he took two companions in his car to a church basketball game at Morganford and Chippewa streets. They started about 8:45 P. M. from St. Lucas Hall at Thirteenth and Gravois. The shortest way there would have been out Gravois to Chippewa, but they did not attempt to go that way because they knew that Gravois was torn up from Thirteenth to Jefferson ("it was blocaded" at their starting point). They also knew that there was construction work going on from Arsenal to Jefferson. On the way out, they detoured to the east and south around all of this part of Gravois, going out Thirteenth to Cherokee and thence west to Morganford, so that they crossed Gravois south of Arsenal. After the basketball game, they went to the home of plaintiff's brother at Ellenwood and Morganford. There they drank "home brew" (plaintiff drank "about three glasses"); starting back shortly after midnight. They were all accustomed to drinking beer and claimed that this beer had no effect on any of them. On the way back, they drove on Morganford to Chippewa, on Chippewa to Gravois, and then northeast on Gravois. There was a drizzling rain, which had been falling all evening, and the streets were slippery. It was also foggy. When they reached Arsenal they all saw the beginning of the barricades in the middle of the street with lights on them.

Plaintiff testified as to the occurrence of his injury (about fifty feet beyond the Oregon Avenue intersection about two blocks from Arsenal), as follows:

"Q. Could you see how the barricades were there? A. I saw them there; they were irregular. . . . Q. Now, these that you saw along there, about how far out did they extend from the cinder, or torn-up part of the street? A. Some were off about a foot, and some two feet. . . . Q. Now, what was the condition of Gravois there from Arsenal down to where you were hurt? A. It was slippery. . . . (Plaintiff said that he had put the brakes on "up the street, when the traffic was moving around (and) felt the car sliding at that time.") Q. What made it slippery, the rain or what? A. It was a sort of white-looking stuff on it, and mud was on it. . . . Q. Now, as you approached Oregon, or just before you got hurt, had you made any change . . . in the speed of the car you were driving? . . . Yes, sir; I did. . . . As I come down there was a car in front of me, and I had an intention to pass that car and the car swerved over to the left, and as it swerved over to the left I slowed up and came back, and I saw a board out in the street, and it came through the car and hit me. Q. How far away from the front—how far from the windshield was that when you first saw it? A. I guess it was about four feet in front of me when I noticed it. Q. How far had you been driving

from the center path? A. I guess about five or six feet. Q. How far out was this board from the cinder path, the end of this board? A. I would judge it would be about four feet from the cinder path. . . . Q. About how high was the end of that board from the surface of the street? A. I judge it to be around about four feet. . . . Q. Were there any street lights on Gravois? A. Yes, sir. Q. It was a well-lighted street, wasn't it? A. Quite, . . . but it did not show up very well that night . . . because it was a sort of fog and drizzle. . . . (From deposition) 'Q. Did you see any lights on it (the barricade)? A. No, sir. Q. You were not noticing that? A. I didn't see it, I didn't see any lights there, or anything like that; of course, I was paying attention to my driving. Q. You wouldn't say whether there were or there were not? A. No, sir; I didn't pay no attention whether there was or was not. Q. Would you say whether there were any lights or not? A. I wouldn't say that there wasn't any lights there, because I didn't see any. Q. But you wouldn't state that there wasn't? A. I wouldn't say that.' Q. Did you give that testimony? A. I don't remember . . . (From deposition) 'Q. Just tell us what happened as you passed (Oregon Avenue) it? A. Well, after that I just tried to pass this fellow up, and the first thing I know—this plank must have been sitting off the pavement—that was all I remember; that was all the further I can remember; when I was getting ready to pass this fellow up, this plank hit me in the face and I was unconscious for a day and a half.' Q. Did you give that testimony? A. I don't remember. . . . Q. Is what I read to you a true account of what happened there? A. I guess it is. . . . Q. Were you about to pass this man up? A. I intended to pass the man up, and the car in front of me swerved over and as he swerved over I slowed up. . . . As I intended to pass the car I turned my wheels a little bit, and as I intended to pass the car slid over a little bit and I dropped back in line and I never passed the man and before I knew it I saw the board in front of me. . . . Q. Did you have a windshield wiper? A. Yes, sir. Q. Was that operating? A. Yes, sir. Q. And you could see through the windshield all right? A. Yes, sir.''

One of plaintiff's companions said that ''when this here fellow drove in front of us George's machine slid over and Baranovic dropped back, and I noticed (our) machine slid a little, . . . towards the barricade.'' The other testified: ''Q. Tell what occurred at that time. A. As we was going down there, there was a car on the front right and he moved over and George dropped back of him, and the (our) car moved over. . . . Q. About how high was the end of that board? A. How high was it standing out? Q. Yes. A. About three feet. Q. How did it get in the automobile?

A. Well, it struck the front fender, when I heard the crash, and I saw it coming up over the radiator and come up through the windshield. . . . Q. So you saw this plank clear enough on that occasion that you could see one end of it was sticking up and the other end was resting on the ground? A. Yes, sir." Both called to warn plaintiff of the board sticking up from the barricade but said the car was then only about two feet from it. Their lights were on but did not help them to see much through the fog and rain. The driver of the car in front intended to make a left turn at the next street intersection. When he moved toward the center for that purpose, his car slid "a little." There were cars parked on the south side of Gravois near the Oregon Avenue intersection and there was another car to the right of plaintiff driving in the same direction. After striking the barricade, plaintiff's foot wedged against the accelerator, causing the car to go to the north side of the street and back again through the barricades at about forty miles per hour. It ran two blocks and was finally stopped, after the ignition was turned off by one of plaintiff's companions, by striking another barricade.

Plaintiff and his companions said they saw no lights on the barricades after those at Arsenal, but they did see the barricades. One of plaintiff's witnesses, in business nearby, said that a watchman came before he closed at seven and put torches on the ground between the barricades; that "they didn't have no lights on them, but . . . they had a torch in the shape of a pineapple;" that "they had wicks in them, and . . . he would place them on the ground; I never saw those lanterns; I just saw those lights; I would call them a torch;" and that "sometimes he would have one maybe, I would judge, twenty-five and maybe fifty feet, and sometimes a hundred; he wouldn't put them at each barricade." Plaintiff's speed, when he struck the barricades, was estimated at from 15 to 20 miles per hour. The speed of the car he intended to pass was estimated at 20 to 25 miles per hour by its occupants.

Defendants had evidence of police officers and others that there was a watchman in charge of lighting the barricades who stayed there all night; that there were red lanterns hanging on each end of all the barricades and cannon ball torches between them, both before and after plaintiff ran into them; that there was a lantern on the barricade plaintiff first struck; and that this lantern was broken when the barricade was knocked down; and that after the accident "all of them that were standing had red lights on them." It was also shown that plaintiff "had the smell of liquor on his breath." (The hospital report offered by plaintiff stated "odor of alcohol on breath.") It was further shown that there were four street lights at the Oregon Avenue intersection, one at each corner;

that there were four lights in each block, two on each side of the street, between intersections; and that these were all 400-candle power lights.

This is not a case where plaintiff was suddenly confronted by an unknown condition. Barricades are partly for the purpose of warning and plaintiff had been passing barricades for two blocks. He knew that he was driving downgrade on a street that was partially obstructed by construction work. He knew that only a few blocks away it was torn up and completely blocked to traffic. He said that this part had been completely closed until that very day. He saw that the center was barricaded and could see these barricades well enough to observe that they were irregular and unevenly placed. Even if some boards were farther out on this pavement than others so as to sufficiently show negligent construction or maintenance, nevertheless plaintiff could and did see this condition and had room to avoid it. Plaintiff's brief says that "when he attempted to pass Hofmeister he was a safe distance from the barricade." But that his movement to the left "forced (plaintiff) nearer to the barricade;" and that, in slowing up, "his machine was caused to slide over several feet" by the slick condition of the street. He was on a one-way pavement wide enough for three lines of traffic, and saw mud and other slick substance on it. He knew it was slick (he even knew that his car had slid once before when he used his brakes), yet he undertook to increase his speed and pass between another car and these barricades. Anyone should know that a car ahead on a city street may prepare to turn at any intersection and anyone should know the result of sudden use of brakes on a wet, slick street. The car ahead was, at least, going as fast as it was safe to go because it slid when it was moved to the left. This court has several times said: "It is the settled law in this State that, while a traveler on a public street or sidewalk may ordinarily presume that the way is clear and in good condition, still, if the traveler knows that the sidewalk or street being used by him is torn up or obstructed by public work being done therein, he cannot go forward, relying on the presumption that the way is clear, but must exercise his faculties to see and discover the dangers that he may encounter from such obstructing public work, and if he fails to do so, and is injured thereby, he cannot recover, on the ground that he himself is guilty of contributory negligence, although the public authorities or the contractor doing the work may also have been guilty of negligence." [Sheffer v. Schmidt, 324 Mo. 1042, 26 S. W. (2d) 592, and cases cited; Waldman v. Skrainka Construction Company, 289 Mo. 622, 233 S. W. 242; Welch v. McGowan, 262 Mo. 709, 172 S. W. 18.] In the Sheffer case, this court held that an automobile driver, who continued at twenty to twenty-five

miles per hour toward a bridge (that he knew was closed for repairs), knowing "that he would be obliged to drive down the side of the embankment to the low ground below, . . . failed to exercise ordinary care for his own safety" and could not recover for his injuries. Certainly plaintiff here was driving at a speed which was almost up to the limit of safety, on a foggy, rainy night and a slick street, for a street not under construction.

■ However, an automobile driver is under a duty to exercise more than ordinary care. [Sec. 7775, R. S. 1929.] In Threadgill v. United Rys. Co., 279 Mo. 466, 214 S. W. 161, and also in Jackson v. Southwestern Bell Tel. Co., 281 Mo. 358, 219 S. W. 655, this court said: "This statute prescribes a rule of conduct. If a violation of the statute occasions injury to others, the person violating it is liable in damages. If, on the other hand, the violation of the statute occasions injury to the person violating it, such person cannot recover for injury to himself, which injury was contributed to by his own wrongful violation of law. His failure to use the highest degree of care in contributory negligence." Cases holding otherwise were overruled. In the Jackson case, in which the plaintiff's car skidded in going too fast around a curve, this court further said that "if his failure to exercise the highest degree of care . . . is apparent to all reasonable men from the undisputed facts shown by the plaintiff's own testimony, then it is the duty of the court to so declare as a matter of law;" that "it will not avail the plaintiff to say that the evidence does not show that he knew that cars would skid in turning on rough ground or clods, such as he encountered;" but that a driver "exercising the highest degree of care, venturing to drive a car upon the public highway at such speed as to skid with the power off 30 or 40 feet over dry clods or rough ground, as did the plaintiff, would before so doing, at least, inform himself as to the common conditions and places in the road which may cause cars to skid." In this case, plaintiff already had information, from previous experience in using his brakes, what would happen if he had to put them on suddenly, yet deliberately drove faster into a situation, where he had to do so, on a street he knew was partially obstructed by construction work. [See, also, Hamra v. Helm (Mo. App.), 281 S. W. 103; Patton v. Jewel Tea Co. (Mo. App.), 15 S. W. (2d) 360; Kaley v. Huntley, 333 Mo. 771, 63 S. W. (2d) 21; Hill v. St. Louis Public Service Co. (Mo.), 64 S. W. (2d) 633; Wininger v. Bennett (Mo. App.), 104 S. W. (2d) 413; all of which apply the rule of the Threadgill and Jackson cases.] We, therefore, hold that plaintiff's own evidence shows that he was guilty of contributory negligence as a matter of law.

The judgment is reversed. *Ferguson* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.