Billy Jim TRANTHAM, Plaintiff-Respondent,

v.

M. E. GILLIOZ and Snyder Construction Company, Defendants-Appellants.

No. 7906.

Springfield Court of Appeals.

Missouri.

Aug. 21, 1961.

Rex Titus and John R. Martin, Joplin, Mann, Walter, Powell, Burkart & Weathers, Jack A. Powell, Springfield, for defendants-appellants.

Lilley, Cowan & Overfelt, Louis W. Cowan, Springfield, for plaintiff-respondent.

RUARK, Judge.

Defendants have appealed from a $7,500 judgment on verdict rendered in favor of plaintiff, now respondent, Trantham be-

cause of injuries alleged to have been sustained when the car in which he was riding at night crashed into, and went over, a dirt "pad" which extended across the pavement of an uncompleted highway then in the process of construction.

The locale of the incident was approximately north of the town of Strafford, which lies on "old" 66 and approximately midway between Springfield on the west and Marshfield on the east.

Highway 66 was being made into a divided highway. On the stretch of road here involved, a concrete pavement had been laid for some time and was intended to constitute the north (westbound) lane of "new" 66. Although the construction had not been finished, this new pavement had (previously) been open so that the public could travel over it. Defendant-appellant Snyder had the subcontract for grading, laying of pipe, and the final finishing for the (approximate) "mile or two" stretch of road here involved. A part of this project consisted in the grading up of State Highway 125 (a north-south road) at a point where it would cross the new highway so that an overpass might be built. The work being done was primarily along the sides of and not on the completed pavement. A week to two weeks prior to plaintiff's accident, a former crossover between the two roads had been closed by barricade and the stretch involved in Snyder's work had been barricaded at both ends. This work had commenced, but, because of weather conditions, it had not progressed continually. The pad which the plaintiff struck was located at the site of the contemplated overpass for Highway 125. This was approximately a quarter-mile from the west end of the section of road involved. In the building of the overpass it was necessary to take dirt from the south side and haul it north across the pavement. The purpose of the pad, as we understand it, was to permit the contractor's heavy equipment to cross and recross the new pavement in the grading operation. It is a customary construction procedure and is required by the Highway Department. The pad itself was made of dirt, was from two to three feet high, from twenty to twenty-five feet in width (east and west), and extended completely across the pavement. Plaintiff's Exhibit 5, a photograph taken several days afterward, shows the pad to be two to three feet high across (approximately) the south two-thirds of the pavement, with another mound or ridge of dirt, several feet higher, atop the pad and extending approximately across the north third of the pavement. Plaintiff's principal witness, Meyers, identified the picture, "that was the position of the dirt," but as to the mound or ridge of dirt atop the north third of the pad he said he couldn't remember whether or not it was there that night.

At the west end of the project strip was a crossroad and a barrier of the "horse type." This barrier appears to have been somewhat battered from having been run into. It extended only halfway, or across one lane of the new pavement.

Now we go to the east end and come westward from Marshfield in the same direction plaintiff was traveling on the night of his alleged injury. The completed divided highway coming west from Marshfield ended at an east barrier. This was a fence-high post and board barrier, extending completely across the north lane of the "new" highway and across the space between this lane and the south lane, so as to effectively turn all westbound traffic into the south or "old" lane. Approaching this barrier from the east (plaintiff's direction of travel) were various signs at different intervals. One was a State Highway Department sign in large letters stating that "This highway improvement is for your future safety and convenience. Please drive carefully." Another was "Detour 300 feet ahead." Another, "Two-lane pavement." Another, "Road construction. Slow." Yet another, "Slow 30 miles." On the barricade itself were red or yellow blinker lights. A large sign in

the center of the barricade said "Detour" with an arrow pointing to the south. Near the south end of the barrier was another sign, ⃞ ←——— 66 .

Going west from the barricade and still following plaintiff's course of travel, at somewhere around 300 feet was the barricade *between* the old highway and the new pavement. This was evidently to bar off what had formerly been a crossover between the old highway and the new. Thence westward the new pavement proceeded approximately parallel with the old except that its course bore a little more north, and the distance between the two gradually widened as the traveler went west.

Although the former crossover was blocked by the inside barrier, there were numerous, or at least several, places where the persistent deviator, if he chose, could leave the detour road and cross back over onto the road yet under construction, this because there were several farmhouses on the north side of "old" 66. Since these houses had access lanes to "old" 66, and since the "new" highway lay between the houses and the old road, these local people necessarily crossed the new pavement to get to the old road. These lanes were not severally barricaded against access by turning down the new road, because, according to the defendant contractor, "It would have been impossible for our forces to work with barricades." There is no question that these local people did, during the period of the barricades, from time to time use portions of the closed road as a matter of convenience, although, as one of the plaintiff's witnesses described it, there were times when part of the new road was torn up, "there was machinery" up and down the road, and "part of the time some sections of the road had something on it, piled on it."

Also workmen engaged on the project drove their cars around the end barricades and parked somewhere near where the immediate work was being done. The project also had the customary quota of inspectors, foremen, and errand men coming and going. Also some men looking for work would drive around the barricades and go down to the then job site. Beyond the use of this section as above related, we find no substantial evidence that it was either open to, or used by, the general public during the period of one to two weeks when the barricades were up. According to defendants' witnesses, the State Highway Commission had the control and direction as to the type and place of signs and barriers. None had been required for this pad.

One Charles Edward Meyers, age eighteen, lived two miles northwest of Strafford. He went to high school at Marshfield and was about to graduate. Marshfield lay to the east, but it was not necessary to use, and Meyers did not live on or customarily use, the "new road," although he had been on it two or three times. He said he had seen other vehicles use the stretch of road but had never met any vehicles on it himself.

Plaintiff Trantham, age thirty at time of trial, was a rural mail carrier with a route out of Marshfield, west, northwest, and southwest, but there is no direct evidence that any of his route followed Highway 66. He owned a Ford Fairlane hardtop, six months new, in good condition, with good lights which would reveal an object 350 to 400 feet ahead (his driver said 300 feet), and good brakes. He and Meyers, the high school boy, in the plaintiff's language, "buddied around together," and Meyers sometimes drove this car. Plaintiff testified that he had used the particular section of the road frequently; that he had taken Meyers home three to five times a week; that sometimes he followed the "regular detour" and sometimes used the section of road in question. He had seen other vehicles on the section. He knew that "it showed a detour." He knew of warning signs to the east of the barricade and of course knew of the barricade and the detour sign there. He explained his

answers in a previous deposition—that he knew they were working on both sides of the highway grading for the overpass—by saying "that road had been there for three or four years. That part of the *laying* was not under construction." But he knew "they were working around that road" and he knew "they were doing some grading there" (at the site of the future 125 overpass). He had seen other vehicles using the section "detoured around." "The road was used by local people."

On Sunday, May 11, plaintiff took Meyers from Marshfield to Meyers' home to get a graduation gown, and back. He accomplished this (with plaintiff driving the car) by driving west on 66 until he came to the east barricade with "flashing red lights or yellow lights" and with "a 'Detour'" pointing to the left onto "old" Highway 66. He drove off onto "old" 66 until he had passed the barricade and then "I turned right back onto the new pavement." The reason for doing this, according to Meyers, was "it is a lot closer to get to my house." He drove on down the new pavement (the section of "new" 66 here in question) past the place where the 125 overpass was contemplated, on west another quarter- or half-mile, where he turned off on the road which led to Meyers' home. Plaintiff and Meyers returned to Marshfield over the same route that evening. There was no pad or obstruction across the road at the scene of the contemplated 125 overpass that evening.

On the next night, May 12, plaintiff and Meyers met in Marshfield at 6:00 or 7:00 p. m. They drove around and talked, went to a cafe, and at 10:00 p. m. they left for Meyers' home in plaintiff's Ford. This time Meyers was driving and plaintiff sat beside him. The lights were on "high beam." They drove around the barricade and followed exactly the same route up to the place of accident, but *this* time there was the dirt pad. There were no lights or other warning at the pad, nor were there any warning signs indicating its

presence at any other place along the stretch of road inside the barrier. They were then driving, according to Meyers, from 60 to 70 mph. Meyers said he first saw the pad, "Oh, I would say a hundred, maybe two hundred feet; I wouldn't know exactly." He immediately applied his brakes as hard as he could (he "should have had" his brakes on 100 feet before he hit the pad), struck the pad "a little bit to right of center," plowed completely across it (20–24 feet), "scooped the gravel as it came over," and came to a stop some 20–30 feet on the opposite (west) side. The whole front end of the car, including the engine and front wheels, was pushed back. When asked why he didn't see the pad before he was 100–200 feet from it, he said:

I can explain that, because where the pad was, it was a slight slope, and the way that I think that the headlights were possibly shining over it and, like I say, when I did see it, it didn't look near as big as it was.

After the car stopped, Meyers looked at plaintiff and

I saw blood running all over his face. Also, he had a big cut, gash, that came right down through here on one of his eyes, and  *  *  *  I asked him if he was hurt, and he said "yes."

Plaintiff testified that they were traveling at a speed of "somewhere in the neighborhood of 60 miles an hour." He said he had a recollection of seeing something across the road which resembled a plowed furrow. He saw it at a distance which he estimated at something like 150 feet, and this was practically simultaneously with the application of the brakes. As to why he didn't see the pad sooner, he offered the reason that the road was slightly downgrade, and because of the decline in the pavement the lights wouldn't shine on it. But there was no hill and no dip and the car followed the terrain. He said the decline started some 200–300 feet east of

the pad and the decline got a little more severe as it went west.

A Missouri State Highway inspector on the project, testifying for the defendants, said the road approaching the pad from the east was about a 1% grade, and that there was nothing to prevent its being seen for so far as the car lights would illuminate the road. Objection as to how far visibility of the pad would extend in the daytime was sustained.

The state trooper who investigated the accident, also testifying for the defendants, said that the road was generally level and that in the daytime a person approaching from the east could see the pad at a distance of one-half mile and at night for "the distance of the headlights." The only exhibit showing the pad (plaintiff's Exhibit 5) does not show the road from the pad completely back to the east, but such portion of the road as is shown appears to be almost level, but slightly downgrade, with no abrupt crest, dip, or other abrupt variance of level.

■ Plaintiff's evidence establishes conclusively that he had the complete right of control over his automobile and its operation and that he made no objection or remonstrance either to going around the barricade and traveling the route taken or to the speed at which Meyers was driving the car. He said he thought a speed of 60–70 mph was reasonable under the circumstances.

Plaintiff submitted his case and here relies upon liability of the defendants on the theory that the general public was using the portion of the highway involved; that the defendants knew or should have known such fact; that in placing the dirt pad across it they created a hazardous situation concerning which they were under a duty to give warning (other than and in addition to the barricades and signs at the end of the stretch of road involved), and this they failed to do.

The defendants make several assignments of error. We will consider that which to us is most apparent, viz., that the defendants' motion for directed verdict should have been sustained because the plaintiff was guilty of (at least) contributory negligence as a matter of law.

■ Since this was a joint journey and plaintiff was the owner of the car and had the acknowledged power of control of the vehicle, he must bear the imputed burden of any negligence of the driver.[1]

■ Ordinarily a traveler rightfully upon a public highway may, in the absence of any notice to the contrary, assume or presume that the way ahead is clear and that it may be safely traveled at a reasonable speed.[2] But this rule does not apply if the traveler knows, or should know, that the road is under construction, especially if it is closed to public travel. The rule then is the reverse. Under such conditions the traveler must use and exercise his faculties to see and discover and to so manage his automobile that he may, by the exercise of care commensurate with the circumstances, avoid any dangers and difficulties which he might encounter in passing over or along such highway. He must proceed with caution.[3] And the duty to

1. Smith v. Wells, 326 Mo. 525, 31 S.W.2d 1014, 1025(12); MacArthur v. Gendron, Mo.App., 312 S.W.2d 146(3); Thurman v. St. Louis Public Service Co., Mo., 308 S.W.2d 680, 685; see James v. Berry, Mo.App., 301 S.W.2d 530(1).

2. 40 C.J.S. Highways § 268, p. 317; 60 C.J.S. Motor Vehicles § 201d, p. 538; Metz v. Kansas City, 229 Mo.App. 402, 81 S.W.2d 462(4); see Rohmann v .City of Richmond Heights, Mo.App., 135 S.W. 2d 378.

3. Hamra v. Helm, Mo.App., 281 S.W. 103; Baranovic v. C. A. Moreno Co., 342 Mo. 322, 114 S.W.2d 1043; Rohmann v. City of Richmond Heights, Mo.App., 135 S.W. 2d 378; Eisele v. Kansas City, Mo.App., 237 S.W. 873; Blashfield, Cyclopedia of Automobile Law and Practice, vol. 5A, § 3330, p. 404; see also § 3321, p. 392;

use such care extends not only to the avoidance of particular dangers which are known or apparent but also to the anticipation and discovery of such obstructions as might be discovered by the exercise of due care.[4]

Another rule which has considerable support by the authorities generally is that sometimes known as the "speed-light-distance rule" (and the closely related "assured clear distance rule"); that is, that a motorist must so manage the speed and control of his automobile as to be able to stop or avoid obstructions in the distance within which his headlights make them discernible.[5] It is true that Missouri courts have rejected the rule in so far as it fixes an inflexible standard applicable in all events and under all circumstances; that is, one is not *necessarily* negligent because of such speed alone. It depends upon the circumstances in each particular case.[6] But it has been applied where the circumstances call for its use,[7] and we think the circumstances in this case practically howl for the application of such rule.

The plaintiff was on a road where he had no business to be. His buddy did not live on that road; it was not at all a way of necessity for either of them; and even as a way of convenience, the way by the plainly marked detour over "old" 66 could not have been materially farther in distance, since the two roads ran practically side by side. He disregarded warnings on the approach and at the barrier which extended completely across the road and up to the paved lane of the detour

highway. He deliberately left a well-marked detour, which he knew to be a detour, to go upon a road which he knew to be in the process of completion. He knew, or should have known, that the various warnings and barriers were not placed there in fun or for their scenic effect. Further than that, he knew that work was in progress along this stretch of road and that grading was being done on both sides of the road at the very place where he was later injured. There is no evidence that he actually knew that an overpass was under construction, but as many times as he said he had been over this road he was bound to know that Highway 125 approached from the south. Despite this fact, he permitted the driver to drive down this closed road at a speed he says was "somewhere in the neighborhood of 60" and which his driver buddy said was between 60 and 70, but at all events at such a speed that after hard braking for a distance of from 100 to 150 feet was sufficient to cause the Ford automobile to mount a two- to three-foot-high barrier of dirt, plow completely across it for a distance of 20–25 feet, scooping up dirt and gravel as it went, with sufficient force to drive the wheels and engine back, and still emerge on the far side and travel for 20–30 feet beyond, a total of some 40–50 feet. Whatever plaintiff's estimate of his speed may be, the physical facts show that it was not at all leisurely. Accepting somewhat doubtfully as probative evidence the explanation which plaintiff and his buddy gave as to why they did not see the pad until they were 100–150 feet from it, that the contour of the road pre-

see Sheffer v. Schmidt, 324 Mo. 1042, 26 S.W.2d 592; Phelan v. Granite Bituminous Paving Co., 227 Mo. 666, 127 S.W. 318, 328; Bean v. City of Moberly, 350 Mo. 975, 169 S.W.2d 393, 395.

4. Waldmann v. Skrainka Const. Co., 289 Mo. 622, 233 S.W. 242; Welch v. McGowan, 262 Mo. 709, 172 S.W. 18; Wagner v. Wells, Mo.App., 261 S.W. 682; Baranovic v. C. A. Moreno Co., 342 Mo. 322, 114 S.W.2d 1043.

5. See 87 A.L.R. 900, annotation; 60 C.J.S. Motor Vehicles § 201i, p. 543.

6. Johnson v. Lee Way Motor Freight, Inc., Mo., 261 S.W.2d 95; Haley v. Edwards, Mo., 276 S.W.2d 153(1).

7. Solomon v. Duncan, 194 Mo.App. 517, 185 S.W. 1141; Sirounian v. Terminal R. R. Ass'n of St. Louis, 236 Mo.App. 938, 160 S.W.2d 451; see Nickels v. Borgmeyer, Mo.App., 258 S.W.2d 267, 278.

vented their sighting the obstruction sooner, and thereby unwillingly placing a lie on the lips of the state trooper and the State Highway inspector, and disregarding the other physical facts, *if* the pad could not have been sighted sooner because of the contour of the road, then plaintiff, having been over this exact stretch a number of times, as he said, was familiar with the character and contour of the road. We think that any reasonably prudent person should and would have anticipated and allowed for the fact that there might be obstructions on the road and that a modicum of caution required that he drive at such a speed as would enable him to discover and avoid them. Under the circumstances of this case the fact that there was no dirt pad at this place the night before did not give the plaintiff the right to assume he could safely pass over the same space the next night.[8] A reasonably prudent person who drives an automobile over the highways— and this applies to rural mail carriers— should know that when a closed road is under construction as this one was, conditions do not remain static and obstructions are likely to occur at any time. Irrespective of plaintiff's personal knowledge, the outside barriers and detour signs alone and of themselves were a notice and warning that somewhere within there was possibility of danger.[9] Despite these circumstances, plaintiff assumed the right to travel this road at a high speed and apparently without any regard for possible obstructions. This we think was arrant negligence. The plaintiff by his own conduct has purchased his injury. He should not now expect someone else to pay for it. It is our opinion that plaintiff was guilty of contributory negligence as a matter of law and that the court was in error in not sustaining defendants' motion for directed verdict. Since this is so, it becomes unnecessary to consider the remaining assignments.

The judgment is reversed.

STONE, P. J., and McDOWELL, J., concur.

8. See Wagner v. Wells, Mo.App., 261 S.W. 682; Sheffer v. Schmidt, 324 Mo. 1042, 26 S.W.2d 592; Fenske v. Kramp Const. Co., 207 Wis. 397, 241 N.W. 349, 351; Christy v. Herbert M. Baruch Corporation, 135 Cal.App. 355, 27 P.2d 660, 664.

9. Gordon v. Illinois Cent. R. Co., 190 Miss. 789, 1 So.2d 772; Miller v. Abel Const. Co., 140 Neb. 482, 300 N.W. 405; Wunderlich v. Franklin, 5 Cir., 100 F.2d 164; Graves v. Johnson, 179 Miss. 465, 176 So. 256, 260; Shawano County v. Froemming Bros., 186 Wis. 491, 202 N.W. 186, 188; Myers v. Sanders, 189 Miss. 198, 194 So. 300; Finkelstein v. Brooks Paving Co., Fla.App., 107 So.2d 205, 207; see Boland v. Thompson, Mo.App., 142 S. W.2d 790; 78 A.L.R. 525, annotation.