KATIE L. FITZPATRICK, Administratrix of the Estate of CHARLES V. FITZPATRICK, v. THE KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant.—146 S. W. (2d) 560.

Division One, January 4, 1941.

*Cyrus Crane, Winston H. Woodson* and *James F. Walsh* for appellant.

*Donald H. Latshaw* and *Johnson, Garnett & Quinn* for respondent.

60

DALTON, C.—This is an action under the compensatory section of the death statute (Section 3263, R. S. 1929, 5 Mo. Stat. Ann. 3371) for the death of Charles V. Fitzpatrick. Fitzpatrick was killed about 3:45 A. M., March 18, 1937, when the automobile, which he was driving, crashed into the side of a freight car in one of, defendant's trains at a crossing in Kansas City, Missouri.

Plaintiff charged defendant with negligence in failing to give any warning that the crossing was obstructed. Defendant charged deceased with contributory negligence in operating his automobile at an excessive rate of speed under the circumstances and in failing to keep a lookout for railroad cars on the crossing. The jury returned a verdict for plaintiff for $10,000 and judgment was duly entered thereon. Defendant has taken the necessary steps to present the cause on appeal.

Appellant contends that the trial court erred in refusing to give its instruction, in the nature of a demurrer to the evidence, as tendered at the close of the whole case. Appellant says, (1) that the evidence was insufficient to make a submissible case of negligence against it; (2) that deceased was guilty of contributory negligence as a matter of law preventing recovery; and (3) that, if defendant was guilty of negligence, such negligence was not the proximate

cause of the collision and death. A detailed statement of the evidence is required. In this statement we shall refer to Fitzpatrick as the deceased, and to appellant as defendant.

The collision occurred at defendant's crossing at Fifteenth Street and Richmond Avenue and just west of the Fifteenth Street Bridge over Blue River. Fifteenth Street is a paved highway extending east and west. Farther east it is known as Van Horn Road. It has four traffic lanes and is heavily traveled at all hours of the day and night. Defendant's tracks extend north and south across Fifteenth Street. The main line is on the east. The switch track is on the west. At the time of the collision, one of defendant's freight trains was standing on the main line track with a large automobile car extending across Fifteenth Street. The car was "a rust color of some kind." "It was a big brown looking car, box car." Plaintiff's witnesses estimate its length at 40 feet, its height at 12 feet, and said that the floor of the car was three or four feet above the rails.

The highway bridge over Blue River is 227 feet in length and is built in the form of an arch over the river. The west end of the bridge is 80½ feet east of the east rail of defendant's tracks. As one approaches the crossing from the east, there is a rise in the pavement as it goes over the bridge. The pavement then gradually descends to a point 33 feet east of the east rail of the tracks. This point, thirty-three feet from the east rail, is four-tenths of a foot, about five inches, lower than the top of the east rail. The highest part of the highway is near the center of the bridge, 200 feet east of the east rail of defendant's track. This point is 1.7 feet higher than the east rail, and it is about two feet and three or four inches higher than the lower point of the swag thirty-three feet east of the east rail. These measurements of elevation are along the center line of the highway. The pavement north of the center line at the dip or swag, east of the crossing, is lower than it is in the center of the highway. The surface of the highway in the center of the bridge is approximately thirty feet above the water in the river.

About one-half block north of the crossing and east of the railroad is the plant of the American Asphalt Roofing Company. According to plaintiff's evidence, when the wind is from the north or northwest, smoke from this plant comes over the bridge and railroad crossing. The crossing is always smoky when the wind is from the north or northwest. The fog and mist from the river and the low ground, and the smoke from the plant, commonly obscure the crossing in the early morning hours. The evidence tends to show that the conditions of fog and smoke and haze existing at this crossing and on the bridge, at the time of the collision, were not unusual. The same conditions existed "lots of times" before, and on many mornings.

Three blocks west of defendant's crossing, Fifteenth Street was crossed by the Frisco and Missouri Pacific tracks, and the crossing

was equipped with flicker signal lights. Defendant's crossing was not marked in any way. The rails did not extend above the pavement but were level with it. There were no flashing lights, no cross-arm railway crossing signs or bells at or near the crossing. No flagman was on guard at the crossing. No warning signals of any kind were given to warn deceased of the existence of the crossing or of the presence of the train thereon. The train was not in motion, and was dark and silent.

At the time of the collision the wind was from the northwest. The train on the crossing was enveloped in a heavy smoke, fog, steam and mist. The atmosphere was very damp, foggy and smoky in the vicinity of the bridge and crossing, but elsewhere clear. The smoke and fog became heavier as one approached from the east over the bridge toward the crossing. It was a dark, cloudy night. The moon was not shining. The electric lights along the street near the crossing, and the lights on the bridge, were not burning. Automobile lights would not penetrate the fog.

The deceased was familiar with the crossing. He had lived out in that district a number of years. There is nothing in the evidence which warrants an inference that he was not familiar with the crossing. Prior to 1933 for four or five years he had been employed by the Witte Engine Works located one block south and one block west of the crossing. For four or five years prior to his death he worked for Weber Engine Company located at Twelfth and Winchester, six blocks west and three north of the crossing. His parents, since 1922, had resided at 6420 E. Sixteenth Street, nine or ten blocks west and two blocks south of the crossing. Deceased resided with his parents at the above address. His father, and his foreman, each testified that they had been over the crossing with deceased on several occasions, although the father said that they usually went another way.

Immediately before the collision the deceased was driving his car west on Fifteenth Street at about twenty to twenty-two miles per hour. He was alone in the automobile. The headlights of the automobile were burning. Without slackening speed, he drove up over the bridge, through the swag or dip in the pavement and into the side of the freight car in defendant's train.

Plaintiff alleged that there was a ''violent collision;'' that deceased's automobile, ''with great force and violence, collided with'' defendant's train. The evidence discloses that as a result of the collision the automobile ''was rammed in under the freight train.'' Plaintiff's witnesses identified pictures of the wrecked car, a 1937 Dodge two door sedan, ''a steel body car.'' These pictures show the headlights, hood, radiator, and grillwork, the windshield and left fender demolished. The right fender appears to be crumpled and bent down. There is a dent in the top canopy over the windshield and the left door is open and ''down somewhat.'' The front wheels, tires and front

bumper appear to be intact. In the wreck the deceased was in some manner caught by the steering wheel but, after the cushion was pulled out from under him, he was removed from the car. In the collision he received injuries from which he immediately died. These injuries to some extent reflect the force of the collision. The post mortem examination disclosed that his face was badly disfigured. The bones at the base of his nose were broken. Manipulation of the head revealed fractures at the base of the skull and in the frontal region, and fractures of the face, involving the maxilla and the lower jaw. The automobile took fire immediately following the collision, but the fire was confined in the wiring of the engine, and was soon extinguished. The automobile struck the freight car just north of center and in front of the rear trucks. ''The whole hood was sticking under the box car.''

The extent of which visibility was affected by the smoke and fog may best be seen by particular reference to the testimony of plaintiff's witnesses. Some testimony that was general on direct examination became definite and certain on cross-examination. Plaintiff's witness Beatty, a salesman for a bakery, was on his way to work with Cecil Green, an ice company employee. They arrived at the scene of the wreck after the train had been moved and the crossing opened. There was fog and smoke over the bridge, and fog and mist and steam coming off of the Blue River. They hit the fog just off the east end of the bridge. Beatty testified: ''Q. Was that a heavy fog on that bridge? A. Well, it was so the lights shining on it you couldn't see through it at all. Q. You couldn't see through it at all? A. You could see, but not very good. It was dangerous to drive into . . . Q. Could you see a hundred feet ahead of you in that fog? A. No. Q. Could you see 50 feet ahead of you in that fog? A. I would say if there had been a tail light or something in front of you that you could have seen it. Q. Could you have seen a man standing in the street 50 feet ahead of you that night with the weather conditions that existed there that night? A. I don't believe you could. Q. If a man had been 15 feet in front of you and on the bridge could you have seen him if he was standing in the middle of the roadway with the weather conditions that you say existed there that night? A. It would have been pretty hard to do because a man is mighty hard to see. You could be right on them and not see them in a fog with lights on a car. Q. You think perhaps you couldn't see a man 15 feet away that night with the weather conditions as they existed? A. It would have been mighty hard to do.''

Beatty further testified that on the morning prior to the accident he approached the crossing in the same manner and that the conditions were exactly the same, except that the crossing was obstructed by a train (the crossing had been opened before he arrived on the morning of the collision). When he was some seventy-five feet back

from the tracks he missed seeing some Neon signs which he knew were further west up the street. He thought there must be something across the road, but he was in twenty to twenty-five feet of the train when he first saw it. He said: ''I was right against it when I got stopped and I wasn't going over 10 miles an hour and I thought sure it had me.''

Plaintiff's witness Green, who was riding with Beatty, testified that on the morning previous, under the same conditions, he didn't see the train on the crossing until they were ''right on it;'' that he was twenty or twenty-five feet from the train when he saw it; that he was looking straight ahead at the time; and that they ''were right in the dip just ready to go up the incline to the train'' when he saw it.

Plaintiff's witness Todd, a taxi driver, saw deceased three blocks east of the Blue River Bridge and followed deceased's car forty to fifty feet behind at twenty to twenty-two miles per hour. Both were traveling west at the same speed and on the inside lane, the second lane from the north side. Witness traveled at the same rate and remained the same distance behind deceased up to the time of the collision. They hit the fog and smoke at the east end of the bridge. It got heavier as they proceeded west. The smoke and fog was so dense that after they ''started up over the bridge,'' witness could not see the outline of deceased's car, but could only detect the tail light. It was a heavy fog. Witness did not see the collision. He heard it. He stopped his car two car lengths (about thirty feet) behind deceased's car and walked up. He testified: ''Q. Did you notice there was a box car on that track before you got out of your car or after you got out of your car? A. After I walked up behind his car. Q. And where was his car at that time? A. It was rammed in under the freight train. . . . Q. Was that a heavy fog? A. It was on this side on the bridge. It wasn't so heavy on the east end but when you got up on the bridge and started this way it was really heavy. Q. Was there a fog on the east end of the bridge all the way up to the railroad track? A. Yes, sir. Q. Was there smoke all the way from the east end of the bridge to the railroad tracks? A. There was. Q. I believe you said the fog was so heavy you couldn't see Fitzpatrick's car? A. That's right. Q. You say the fog was so heavy you couldn't see this box car on this crossing? A. You couldn't. Q. And the fog was that heavy? A. The fog and smoke. Q. And the fog and smoke was so heavy from some point east of this bridge all the way across this bridge and up to this railroad track, isn't that a fact? A. I didn't say it was heavy on the east end of the bridge. . . . I said it began on the east end of the bridge. Q. At any rate you never saw this box car? A. No, sir. . . . Q. And that condition existed from the time you reached the east end of the bridge and you went west some 200 feet, all the way up to the crossing, and you couldn't see this box car or any

other object on account of the fog and smoke, is that correct? A. Well, you could see his tail light. You could see a light or anything like that. Q. But you couldn't see that box car? A. No. Q. And all you could see was the tail light? A. That is all. Q. And you continued driving that morning some 22 miles an hour, 20 or 22 miles an hour, is that correct? A. Yes, sir. Q. And the deceased drove his car there at the rate of speed of 20 miles an hour? A. I don't know just how fast he was going, he couldn't have been going over 20 miles an hour. Q. That is your judgment that he was going 20 or less? A. Yes, sir. Q. And he drove at that rate of speed from the east end of this bridge through this fog and smoke all the way up and until the time the collision occurred, is that correct? A. Well, I suppose he did. . . ."

The witness admitted the following prior testimony in depositions and said the questions were asked; that he made the answers; and that they were correct. "Q. Could you see an object in the street or a wagon or that sort of thing with the condition that existed there, with your headlights, 15 feet away from you? A. I don't believe I could have, no. . . . Q. What would be your judgment of the distance you could see an object there that night with the headlights that you had your car equipped with? A. Oh, I don't know, 7 or 8 feet, something like that. . . . Q. Suppose a man had been standing still in the street, what distance could you have seen him with your headlights, with the weather conditions that existed there? A. I doubt whether you would have saw him at all or not, if you had been driving 18 or 20 miles an hour. Q. You don't think you would have seen a man standing in the street at all? A. No. . . . Q. Your headlights were in good condition that night weren't they, Mr. Todd. A. Yes, sir."

. Plaintiff's witness Argo, who answered the fire call, testified: "Q. When you got down there near the track could you see out sideways? A. Not down there, not very far, no. Q. About how far could you see sideways down there? A. You couldn't see across the street. Q. You couldn't see across the street? A. No, sir. . . . Q. When you were 100 feet west of the railroad tracks in question there that morning, and your truck was traveling in the center of Fifteenth Street going east with the darkness and mistiness and fogginess that you say existed there that night do you think you could see to the south or could you see the south curb line of Fifteenth Street? A. I could see, you couldn't any more than see it, no. Q. You couldn't see beyond the south curbing of Fifteenth Street at any rate. A. No."

Plaintiff's witness Spruce said that the first thing he noticed was the tail light of the car that stood just back of the car that had collided with the box car; that when he got to the west end of the bridge he did not see any box car or object blocking the crossing;

that he did not see anything only the automobile until he got to it; that when he first saw the box car the flash of the blaze showed that the box car was there; that he saw the fire forty feet back of the wreck but did not see the train until he walked up to the wrecked car; that when he got out of his car about forty feet back of the train he could tell there was an object on the track but whether it was a box car or not he couldn't say until he walked.up to the wrecked automobile; that he struck·the smoke about 100 yards east of the east end of the bridge; and that it was heaviest right over the river.

Plaintiff's evidence further tended to show that the top of the headlight glass on a 1937 Dodge stood forty-two inches above the ground; that the center of the light beam at the car was thirty-six inches above the ground; that at twenty-five feet distant, with driving lights on, the center of the beam was thirty-three inches above the ground, when the lights were properly adjusted to comply with the law and not go higher than forty-two inches in seventy-five feet; that if the rear of the automobile was raised seven inches the center of the beam of light at twenty-five feet would be lowered from thirty-three inches to twenty inches; that with the car level, and the low beam on, the center of the beam would be twenty inches from the ground at twenty-five feet ahead; that the light from headlights spread to a certain degree the farther you get away from an automobile, but as much as possible the beam is confined to the straight ahead position; that the witness had not measured the spread of the light beams or the top of the light area at twenty-five feet; that, with the driving lights on, after one crossed the crown of the Blue River Bridge and started down toward the railroad track, "the focus of the rays of your headlights would show below any object on the track, unless it would be the wheels or the trucks of a box car;" and that that condition would continue "until you started to level off to get ready to make the incline to cross the track;" that on level ground with the lights' rays down they would strike about thirty-five to forty feet in front of you; that as an automobile would move from east to west over the bridge the automobile headlights would be thrown upward as one approached the crown of the bridge, then level off, then be cast down, until the car reached the lowest part of the swag, then level off again, and finally they would be thrown up as the car started up the grade toward the tracks, but the lights would not be thrown up until the rear wheels of the car were in the lowest part of this dip or swag thirty-three feet east of the tracks and the front of the car would be fifteen to twenty feet from the track.

Defendant's evidence tended to show that its engine and twenty-eight automobile cars were headed south on the east or main line track; that the train was on its way to the Chevrolet plant at Leeds; that, as the engine approached the Fifteenth Street crossing, the headlight

of the engine was burning and the whistle was blown for the crossing and the bell rung; that the flagman came out to the center of the street with a red lantern and flagged the crossing until the engine had passed; that the flagman then returned to his shanty, where he had been for only a few minutes, when he heard the crash of the collision; that, at or about the time the engine crossed Fifteenth Street, the engineer in charge learned for the first time the extent of switching to be done on the trip; that the engineer then decided to stop and take water at the water tank south of Fifteenth Street; that he brought his train to a stop with the engine about three car lengths north of the water · tank and with the seventh car of the train standing across Fifteenth Street; that one of the brakemen started back to cut the crossing, and was about three and one-half car lengths back, when the collision occurred; that the train had been stopped from one to one and a half minutes; that the box car involved in the collision was forty feet and six inches in length (inside measurements), and fourteen feet eleven and one-half inches high; that it was three feet six inches (forty-two inches) from the rail to the floor of the car and two feet five inches (twenty-nine inches) from the rail to the center sill of the car; that an inspection of the car after the collision showed a mark in the steel rail, called the side door run, made of superstructural steel and there was also a dent an inch to an inch and a half in depth to five inches in length on the side of the car; that the car was painted red with white lettering; that it was a steel car with wood siding; that a crossing light of 600 candle power was located twelve to fifteen feet west of the west rail of the west track on the south side of Fifteenth Street and was burning; that this light was maintained by the Kansas City Light and Power Company but at the expense of the defendant company; that a 250 candle power light near the center of the river bridge on the north side of the street and a 250 candle power street light at the east end of the bridge were burning; that both of these lights were maintained by the Kansas City Light and Power Company and paid for by the city; and that the records of the inspectors of the light company showed that the lights were burning the night of the collision.

Defendant's evidence further tends to show that at the time of the collision visibility at the crossing was good; that there was no fog, mist or smoke at the crossing; that it was not dark or cloudy, but clear; that the street was dry; that some of the firemen answering the fire call, approaching from the west, saw the train five or six blocks away, as they approached; that two of the firemen, Davis and O'Connor, were at the fire pump when the cab driver came up and volunteered the information that the deceased's car had passed him three or four blocks back at sixty to sixtyfive miles an hour (this was denied by witness Todd).

■ The negligence charged in the petition is primary negligence. If the deceased was guilty of contributory negligence which directly contributed to produce his injury and death, the plaintiff cannot recover. Plaintiff may not maintain an action under the statute if deceased could not have maintained an action for damages had he survived. [Section 3263, R. S. 1929, 5 Mo. Stat. Ann. 3371; Worth v. St. Louis-S. F. Ry. Co., 334 Mo. 1025, 1029, 69 S. W. (2d) 672, 674.] Whether or not defendant was negligent in the respect charged in the petition is immaterial if deceased was guilty of contributory negligence. In view of the conclusion we have reached, it is only necessary for use to determine whether or not the deceased was guilty of contributory negligence as a matter of law.

■ The question of deceased's contributory negligence was for the jury unless it can and should be said, as a matter of law, that deceased failed to exercise the highest degree of care; that is, such care as would ordinarily be exercised by a very careful person under the same or similar circumstances. If the evidence bearing upon that subject is such as to leave no room for a difference of opinion and brings all reasonable minds to the conclusion that the deceased, at the time and place of receiving his injuries, failed to exercise the highest degree of care under the circumstances in the operation of his automobile, the plaintiff cannot recover. In determining whether the deceased was guilty of contributory negligence, as a matter of law, the evidence in plaintiff's favor, of course, must be accepted as true and plaintiff must be allowed the benefit of every reasonable inference in her favor which can be drawn from all the evidence.

■ Section 7775, R. S. 1929, 7 Mo. Stat. Ann. 5197, required the deceased, in the operation of his automobile, to "drive the same in a careful and prudent manner, and shall exercise the highest degree of care, and at a rate of speed so as not to endanger the property of another or the life or limb of any person." Plaintiff's main instruction, among other things, required the jury to find, (1) that deceased "could not, in the exercise of highest degree of care, see the obstructed condition of said crossing;" (2) that "the said train of cars was obscured and not discernible to persons in the exercise of the highest degree of care approaching the said crossing from the east in automobiles;" and (3) "that the said Fitzpatrick was at said time and place exercising the highest degree of care for his own safety." Was such an issue for the jury?

It is unnecessary to review the evidence as to the density of the smoke and fog or the extent to which visibility was affected from the time deceased started up over the bridge at a distance of more than 300 feet from the crossing. Plaintiff's evidence, with reference to the conditions existing, has been set out at length. It must be considered as a whole and in a light most favorable to plaintiff. Much of the evidence relied upon by plaintiff to make a case of negligence

against defendant is equally applicable to the issue of contributory negligence by the deceased. The evidence shows that the Blue River Bridge and the vicinity of the crossing, extending as far as 100 feet west of the crossing, was enveloped in dense smoke, fog, mist and steam; that the fog began at the east end of the bridge, although some of plaintiff's witnesses placed it further to the east. In any case it became denser as one approached appellant's crossing. From a point at least 200 feet east of defendant's crossing the fog was so dense that automobile lights would not penetrate it. There is no evidence that the smoke and fog was in pockets or intermittent between the east end of the Blue River Bridge and defendant's tracks. With conditions existing, as disclosed by plaintiff's evidence, the deceased did not slacken the speed of his automobile prior to the moment of the collision. For more than 200 feet, from the crown of the bridge to defendant's tracks, the deceased drove ahead while his view was obscured by a heavy fog and smoke. The freight car was not the only thing that could not be seen. The evidence shows that other objects were quite as difficult to see. The evidence is that the headlights of an automobile would not penetrate the fog, not that the headlights of deceased's automobile did in fact pass under the freight car and fail to reveal its presence. According to plaintiff's evidence under the same conditions, and at about the same hour of the preceding night, the driver and passenger in the Beatty automobile, although looking straight ahead, with the aid of the automobile headlights, did not see a similar train on the crossing until they were within twenty to twenty-five feet of the track. "A wagon or that sort of thing" on the street could not have been seen fifteen feet away with the aid of headlights. It would have been very difficult to have seen a man in the street at that distance. The evidence shows other facts tending to show the extent to which visibility was affected.

Respondent insists that the evidence "abundantly justifies the finding . . . that the atmosphere in the immediate area was so foggy, hazy, smoky, and murky that the lights of his (deceased's) automobile did not penetrate it and disclose the obstructing freight car," and that "Fitzpatrick could not see the obstructing freight car." Respondent assigns as one of the causes of the collision, "the fact that his (deceased's) vision, for the short space between the time he entered the pocket of fog and the time he reached the railroad tracks, was obscured by fog." "A pocket of fog and smoke, . . . had settled in the area immediately east of the crossing so that the obstructing train was wholly obscured thereby."

The respondent concedes that "the actual rate of speed is not in dispute. . . . It is fixed by the eyewitness Todd at about 20 miles per hour." The rate of speed is further corroborated by the conceded results of the impact of the collision. At least the conceded facts do not indicate a lesser rate of speed.

Respondent contends that there was no evidence to show that deceased was familiar with the crossing or was aware that he was approaching it; that no witness testified that deceased said anything about the crossing or indicated that he ever saw a train on it; and that who can say deceased didn't believe the railroad had been abandoned. Respondent insists that under the evidence ''the crossing in question was not a known crossing;'' that ''the burden was, of course, upon the defendant to prove affirmatively that Fitzpatrick was so familiar with the crossing in question that he knew or in the exercise of the highest degree of care should have known, at the time he entered the fog pocket, that he was actually approaching a railroad crossing;'' and that ''defendant wholly failed to sustain that burden of proof.'' Respondent says, ''In any event the question is whether or not a very careful person possessed of the knowledge Fitzpatrick actually had, would have known that a railroad crossing was immediately in front of him is at most only a question for the jury.'' In view of this contention we will review the evidence on this issue.

Appellant's crossing had been in existence for many years. It was a main line crossing. The Frisco and Missouri Pacific crossed Fifteenth Street, three blocks further west. Deceased had worked for the Weber Engine Company in the vicinity of appellant's crossing as early as 1913 or 1914. He had lived in that district a number of years. For four or five years he worked for the Witte Engine Works one block south and one block west of appellant's crossing. He had operated an automobile since 1914. He had driven his automobile over the crossing on different occasions with at least two of the witnesses. Without objection, they testified that he was familiar with the crossing. For a number of years he had resided with his parents at 6420 East Sixteenth Street, nine or ten blocks west and two blocks south of the crossing. It was between 3 and 4 o'clock A. M. at the time of the collision and deceased was traveling in the direction of his home. We may not infer that he was lost.

Deceased approached the crossing from the east, going west, thirty-three feet east of the crossing was a dip or swag in the pavement. Eighty and one-half feet east of the crossing was the Blue River Bridge. The bridge was 227 feet in length. The crown of the bridge was approximately 200 feet east of the crossing. There was a total difference in elevation between the crown of the bridge and the bottom of the dip of two feet and three or four inches. The east end of the bridge was lower than the west end. It is common knowledge that such changes in elevation of the highway would be noticeable to the driver or occupants of an automobile traveling at twenty miles per hour over the highway.

In view of all of the evidence the deceased must be held to have known of the crossing and that he was approaching it. Being familiar

with the existence of the crossing, the deceased was required to exercise the highest degree of care under the particular circumstances. It was his duty to anticipate that there might be cars or a train upon the crossing at any time and to regulate the speed of his automobile accordingly. In the exercise of the highest degree of care he could not assume that the crossing was clear, but instead he was required to exercise care commensurate with the circumstances. There are no facts here for a jury. No room for a jury to infer or find that deceased did not know of the existence of the crossing or that he was approaching it. We take the facts from plaintiff's evidence and must apply the law to these facts in determining whether the deceased was exercising the highest degree of care.

A motorist, familiar with the existence of a railroad crossing, is chargeable with knowledge of, and hence is required to anticipate, the possible presence of a train standing upon or moving over the crossing. [State ex rel. Kansas City Southern Railway Co. v. Shain, 340 Mo. 1195, 105 S. W. (2d) 915, 921; Monroe v. C. & A. Railroad Co., 297 Mo. 633, 249 S. W. 644, 650; Kelsay v. Mo. Pacific Railway Co., 129 Mo. 362, 30 S. W. 339; Sheffer v. Schmidt, 324 Mo. 1042, 1054, 26 S. W. (2d) 592, 597; Fannin v. Minneapolis & St. Paul Railroad Co., 185 Wis. 30, 200 N. W. 651; Rowe v. Northern Pacific Ry. Co., 52 Idaho, 649, 17 Pac. (2d) 352; Gallagher v. Montpelier & Wells River Railroad Co., 100 Vt. 299, 137 Atl. 207, 209; Dumbolton v. Oregon-Washington R. & Nav. Co., 186 Wash. 433, 58 Pac. (2d) 806, 807.]

In the case of State ex rel. Kansas City Southern Railway Co. v. Shain, supra, a motorist, while his vision was obscured, drove ahead and crashed into the side of a freight car in a train, standing on the crossing, although he knew of the presence of the railroad tracks and that there might be a train thereon at the time he proceeded. The court said: "But if we are wrong in holding as a matter of law that plaintiff could have seen the freight car in time to have stopped, let us take the plaintiff at his own word, that he could not see the car when he was within 10 or 12 feet of the railroad track because of the swirling snow and dust. In that situation he was clearly guilty of contributory negligence as a matter of law in dashing forward as he did, when he could not see, with such force and violence that he crashed into the freight car for half the length of the engine even after he had been strenuously applying the brakes for a distance of 5 or 6 feet, or as much of it as the automobile had not traversed before the brakes took hold. It was his duty to exercise care commensurate with the circumstances, and if necessary, to continue to look until he could see ahead, even up to the crossing."

In the case of Sheffer v. Schmidt, supra, the plaintiff was driving his automobile on a dark and unfinished highway upon an embankment. Having been over the road a few hours before, he knew the

embankment came to an abrupt end and that was unmarked, but he failed to slow down the speed of his automobile before coming to the end of the embankment, which he knew he was approaching, and as a result the automobile went down the side of the embankment and he was injured. He was held guilty of contributory negligence as a matter of law in failing to exercise *ordinary care* for his own safety directly contributing to his injury.

In the case of Monroe v. C. A. Railway Co., supra, it was held that a motorist approaching a known railroad crossing must employ effective means to determine whether or not danger is present and a failure to so bars recovery.

In support of her contention that the issue of contributory negligence of the deceased was for a jury, respondent cites some forty cases from this and other jurisdictions. Some of the cases are guest cases, where the guest was only required to exercise the care of an ordinarily prudent person under like or similar circumstances (*ordinary care*). Some are cases from jurisdictions where the operator of a motor vehicle is only required to exercise *ordinary care* for his own safety and others are Missouri cases decided on the theory that the plaintiff, as the operator of the automobile, was only required to exercise *ordinary care*. In the case under consideration the deceased was required to exercise the highest degree of care and the cause was tried on that theory. A case for a jury on the issue of contributory negligence would, of course, be more easily made in a case where the deceased was only required to exercise ordinary care as compared with one where he is required to exercise the highest degree of care, as here. Other cases cited include (1) cases in which there was an absence of evidence and, therefore, a presumption that due care was exercised by deceased, (2) cases where there was conflicting evidence as to the exercise of care, (3) cases where the motorist looked, but due to special conditions of fog and other obstructions, he failed to see the approach of trains over crossings. Other cases deal with collisions with unexpected obstructions in streets where there was no reason to apprehend that there would be an obstruction. In our opinion all cases cited are clearly distinguishable from the case at bar, and are not applicable under the particular facts in this case. We will refer to the more nearly applicable cases, however, they are not applicable here.

Respondent relies particularly on the case of Poehler v. Lonsdale (Mo. App.), 129 S. W. (2d) 59. Respondent says: "That, truly is a case on all fours with the case at bar." In the Poehler case defendant's train blocked a crossing in St. Louis County at night for an unlawful period of time with no signals or warnings of the presence of the train. Plaintiff was *unfamiliar* with the highway, and did not know of the crossing, or that he was approaching a crossing. He approached at a speed of twenty miles per hour in a dense fog and

struck near the center of a black coal car on the crossing. Plaintiff could see the pavement twenty to twenty-five feet ahead and he could stop his car in twenty to twenty-five feet. He was looking ahead but did not see the train or coal car. The question of his contributory negligence was held for the jury.

In the case of Love v. Kansas City (Mo. App.), 118 S. W. (2d) 69, the plaintiff drove his automobile into a girder of a viaduct just after he entered a smoky fog which killed his vision. "Plaintiff did not drive in a fog but struck the smoke and the girder at approximately the same time." No attempt was made to show plaintiff knew the location of the viaduct or that he was approaching it or that he knew he was in that vicinity. The question of plaintiff's contributory negligence was held for the jury.

In the case of Elliott v. Mo. Pac. Ry. Co., 227 Mo. App. 225, 52 S. W. (2d) 448, 452, a motorist collided with a freight train on a crossing. The crossing had been blocked for an unlawful length of time on a foggy night and no signals or warnings provided. The cause was ruled on demurrer to the petition. Defendant contended the petition showed contributory negligence as a matter of law. The court said: "We are at a loss to discover wherein the petition discloses as a matter of law any such negligence on plaintiff's part. The petition says plaintiff, in approaching said crossing, 'was in the exercise of due and proper care' and 'had no warning or signal of any kind' of the existence of said obstruction and, by reason of the darkness, the foggy and misty condition of the atmosphere, the dark color, condition, and location of the cars, plaintiff could not, by the exercise of proper care, and did not, discover said cars until the automobile was too close to the obstructing cars to avoid the collision' . . . It is not a case of failure or negligence to see that which was visible, but of inability to see what was in fact an obstructed, but appeared to be, an open roadway. . . . We do not controvert for a moment an idea that if plaintiff drove his automobile in the dark onto the crossing knowing that he could not see what, if anything, was there, he would be guilty of contributory negligence as a matter of law."

In distinguishing the case at bar from other cases cited by respondent we may say deceased was not temporarily blinded by the lights of an approaching automobile or by a fog pocket; the collision did not occur immediately after he entered the fog; he did not encounter an obstruction in the highway in a place where he had the right to assume the way was clear. In this case, knowing of the existence of appellant's railroad crossing, deceased drove toward it through the dense fog and smoke for approximately 200 feet without slackening the speed of his automobile. In our opinion plaintiff's own evidence made an affirmative showing that the deceased operated his car at a negligent rate of speed and failed to exercise the highest degree of care for his own safety under the circumstances. In view

of the affirmative proof there is no room for any presumption that deceased was in due care for his own safety. Deceased was guilty of contributory negligence as a matter of law and plaintiff cannot recover.

The judgment is reversed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.