Dixie Lee ZUBER, John Stanley Zuber, Jr., Patricia Ann Zuber, Sue Ellen Zuber, and Barbara Jean Zuber, Minors, by their mother and next friend, Ida Coleen Zuber, Plaintiffs-Respondents,

v.

CLARKSON CONSTRUCTION COMPANY, a Corporation, Defendant-Appellant.

No. 46083.

Supreme Court of Missouri,

Division No. 1.

July 14, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 8, 1958.

Jack G. Beamer, McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, for appellant.

Arthur B. Taylor, Independence, and Walter A. Raymond, Kansas City, for respondents.

DALTON, Judge.

This cause comes to the writer on reassignment. It is an action for the wrongful death of plaintiffs' father. Verdict and judgment were for plaintiffs for $15,000 and defendant has appealed.

This is the second appearance of this cause in this court. The sufficiency of the petition upon which the cause was tried was determined on the prior appeal. Zuber v. Clarkson Construction Co., 363 Mo. 352, 251 S.W.2d 52. The allegations of negligence are fully reviewed in the former opinion to which reference may be had for a more detailed statement.

Error is now assigned on the action of the court in overruling defendant's motion for a directed verdict presented at the close of all the evidence for the reason that "the evidence failed to establish any duty owed by defendant to plaintiffs' decedent."

To briefly outline the factual situation presented on this appeal we shall make use of plaintiffs' principal instruction submitting the cause to the jury. The facts and circumstances existing prior to the date of the death of plaintiffs' decedent (John S. Zuber) are not necessarily decisive of the issues presented and we will assume, without deciding, that considered in a light most favorable to plaintiffs the evidence was sufficient to support a finding of the following facts as submitted by the first part of plaintiffs' instruction, to wit: "* * * that from about April 15, 1949, until after May 29, 1949, the defendant was engaged in constructing an earthen levee south of the Missouri River in the vicinity of North Monroe Street in Kansas City, Missouri; and that in doing said work it used certain large diesel powered tractor and trailer combination, earth moving machines which made a great noise

when in operation, known as 'Euclids' or 'Eucs'; and that at the close of the day's work and on Sundays and holidays it parked said vehicles north of or inside said levee near said North Monroe Street, and left them unattended; that it customarily left said vehicles standing unattended; that it customarily left said vehicles standing unlocked, with fuel in the tank, with the air brakes drained and not in operating condition, with the electric starter connected and ready to operate when pressed upon; and that the place where said vehicles were parked was open and unimproved land owned and maintained by the City of Kansas City, Missouri, and the United States Government; and that there were no fences, barricades, no trespassing or other warning signs at or near said place; and that the public had access to and frequented said place; and that for a period of a month or more before May 29, 1949, men and boys congregated on and around said parked vehicles after working hours and on Sundays and holidays and operated said vehicles up and down inside said levee; and that the operation of such vehicles under such circumstances was dangerous to the persons on or near said vehicles; and that defendant knew of such practice and the dangers arising therefrom; and that prior to Sunday, May 29, 1949, defendant left four of its said vehicles parked north of the levee near said North Monroe Street at a place and in the condition it customarily left them as aforesaid; * * *.".

The instruction further submitted the happenings on the day of the decedent's death, as follows: "* * * that about 4:30 P.M. on said day John S. Zuber and James Canterbury were attracted to said place by the presence of said vehicles and undertook to and did operate two of said vehicles; and that while they were so engaged one or the other of said vehicles was caused to come into violent contact with John S. Zuber in such a way as to injure him so that he died almost immediately thereafter; * * *."

The negligence of defendant, as submitted by the instruction, was as follows: "* * * that the defendant was negligent in leaving said vehicles at said place in the operative and dangerous condition as aforesaid; and that the defendant was negligent in leaving said vehicles in said operative condition without guards in attendance in a place accessible to and frequented by the public; and that defendant was negligent in failing to lock or disconnect the starter so as to prevent said vehicles being operated by the members of the public; and that as the direct and proximate result of such negligence of the defendant as submitted above in this instruction said John S. Zuber received injuries from which he died on said date * * *."

Whether there was substantial evidence to take the case to the jury and support the assignments of negligence submitted in view of the circumstances attending Zuber's death will be determined after a further review of plaintiffs' evidence.

The Euclid Carry-alls in question, tractors and trailers, were 37 feet 6 inches overall in length, 9 feet 6 inches in breadth, 9 feet and 2 inches high, were powered by 150 horse power diesel engines, had air brakes only on the tractors and only mechanical brakes on the trailers, had 24 inch disc wheels, a steering wheel and a carrying capacity of 14 cubic yards and a weight of 32,000 pounds or 16 tons. The tractors were not equipped with ignition systems or locks. They had no switches and were wired direct. The air brakes worked only when the engine was operating. After the motors had been stopped for a time, it was necessary to operate the motors for 3 to 5 minutes to build up pressure to make the air brakes effective.

On the morning of May 29, 1949, Canterbury and Zuber, who were cousins, went fishing on the Missouri River. Zuber brought a half pint of whiskey which he shared with Canterbury and two other fishermen and they cooked and ate fish on

the river. As to other facts, we adopt, with slight modification, respondents' statement, as follows: About 3 p. m. Canterbury left decedent with the fishermen and went to decedent's house. Later Canterbury heard one of the "Eucs" start up. He then walked over across the levee and saw his cousin running one of the "Eucs" which had been parked on the east side of the street. Decedent had not previously operated a Euclid Carry-all. Canterbury, however, had operated a "Euc" while in the army in Germany for, he imagined, five weeks steady and off and on on different jobs. Canterbury then went down the road to another machine and started it up and was sitting there in it. He simply pushed on the starter button with his foot and the motor kicked right on over and started. There was diesel fuel in the tank. He then heard compressed air coming out of the tanks which notified him that the pet-cock valve was open and there were no air brakes on the tractor. He then shut the pet-cock valve off and ran the motor 3 to 5 minutes to build up the pressure. As he sat there building up pressure, he noticed decedent coming around from the east or Canterbury's right rear. Decedent "pulled up" alongside on an angle and stopped his machine 5 to 7 feet from Canterbury's, headed northwest with the front end of decedent's tractor about opposite the hind wheels of Canterbury's tractor.

After some conversation between the parties (which the court excluded) the evidence shows that Canterbury last saw decedent "standing in his tractor," or "on the tractor." Canterbury then turned away and for about half a minute was feeling the gears out, getting in low gear so he could take on up the road. Without looking again he drove on up the road a quarter to a half block and looked around and saw decedent was not following him He went north to a place to turn around to the east and came back to where decedent was. As he approached he saw decedent on the side of the road underneath the machine he had been operating. Canterbury then made a turn and parked approximately on an angle but up 30 or 40 feet further north from where he had parked before.

Decedent was lying on his back, with his head and body down to his knees, under the tractor of the machine with his feet extending out from the west or left side of the tractor. Canterbury "didn't see what happened" and did not remember whether the motor of decedent's machine was running or not. Decedent was not breathing and was unconscious. Canterbury attempted to give decedent artificial respiration but found it was no use. He then moved decedent away from the tractor and went for help. No other persons were present.

Decedent was 26 years of age, in good health and employed as a laborer by the Kansas City Power and Light Company at the time of his death. The death certificate gave shock-hemoperitoneum as the cause of death. The autopsy report of the coroner stated decedent's body showed "evidence of a recent abrasion fairly massive in character involving the right chest in the mid and lower portion characterized by loss of skin at that site with a so-called burned abrasive appearance"; 1500–2000 CC clotted blood was found in the peritoneal cavity; there was a tear in the diaphragm; the lower aspect of the right lung was also lacerated; the liver almost pulpified and the final diagnosis was "Diagnosis: Perital hemorrhage into the peritoneal cavity subsequent to the traumatic pulpification of the liver following injury." Defendant offered no evidence.

As stated, the prior opinion reviewed the allegations of the petition. Some of these allegations were summarized therein as follows: " * * * that at the close of the day's work on May 29th [May 26th] defendant parked two of its Carry-alls, numbers 712 and 101, and left them unattended in a public place on or near the levee; that the Carry-alls at the time and place were left in gear, with the ignition switches unlocked and the self-starters ready to

operate but with the brakes off and not in an operating condition; that about 4:30 in the afternoon of May 29th and after the machines had been so parked and left unattended in the stated condition, plaintiffs' decedent, John Stanley Zuber, and one James W. Canterbury were attracted to the machines; that, while plaintiffs' decedent was standing near the left rear tractor wheel of defendant's Carry-all No. 101 which was then stationary, Canterbury started defendant's Carry-all No. 712 and drove it forward toward the north and upon and over plaintiffs' decedent thereby crushing him and inflicting upon him body bruises and internal injuries from which he died almost immediately thereafter * * *." 251 S.W.2d 52, 54.

On trial, after remand, verdict and judgment were entered for plaintiffs and, after defendant's motion for a new trial was filed, the court, on motion, permitted plaintiffs to amend their petition by striking from their petition the words: "which was then stationary, said James W. Canterbury started up defendant's said Euclid Carry-all No. 712, and drove it forward toward the north against and upon and over plaintiffs' decedent," and inserting in lieu thereof, the following words, to wit: "said James W. Canterbury was operating Euclid Carry-all No. 712 nearby and one or the other of said vehicles was caused to come into violent contact with plaintiffs' decedent." (Compare with plaintiffs' instruction, supra.)

The theory upon which this court, on the prior appeal, held that a cause of action was stated against defendant appears from the prior opinion, as follows: "It may be fairly implied from the allegations of the petition that the curious persons, including plaintiffs' decedent, who came to see the Carry-alls, were not trespassers; they had a lawful right to be in the proximity of defendant's machines which, as stated, were parked unattended in a public place. Now it was alleged that defendant's large motor-driven, earth-moving ma-

chines were left unattended in the public place without operative brakes, fueled up, in gear, and with the ignition switches in such a condition that they could be turned on and the machines started. Although the machines as they were parked and at rest on or near the levee were not especially dangerous if no human agency intervened, yet, fueled up, with ignition switches unlocked and with inoperative brakes, they were potentially dangerous, and, if one were started by some reckless person or by some intermeddler probably unskilled in the technique of its operation, it would (and did) become a monstrous instrumentality of destruction. It seems to us it could be reasonably said the person, defendant, the owner and responsible for these machines, with knowledge that curious intermeddlers were making the practice of operating the machines, had reason to anticipate or foresee that other intermeddlers would start the machines and that, among those who operated the machines, some person, though an adult, starting a machine would be reckless or unskilled. It is not too much to say that, in the circumstances averred, a reasonably prudent person should take into account these probabilities, and would foresee that some injury was likely to ensue." 251 S.W.2d 52, 56.

It is apparent, we believe, that in determining whether defendant owed a duty to plaintiffs' decedent, and in determining whether a cause of action was stated by plaintiffs against defendant, this court assumed, as it had the right to do from the allegations of the petition, that plaintiffs' decedent was an innocent third party and not an active participant in the operation of said machines, nor a party to the commission of any crime with reference thereto. Note the words of the opinion: "It may be fairly implied from the allegations of the petition that the curious persons, including plaintiffs' decedent, who came to see the Carry-alls, were not trespassers; they had a lawful right to be in the prox-

imity of defendant's machines which, as stated, were parked unattended in a public place."

Defendant-appellant now contends, and one of the grounds assigned in support of defendant's motion for a directed verdict was, that at the time of the death of plaintiffs' decedent, the said John Zuber was engaged in committing a criminal act, to wit: driving, operating, using or tampering with a motor vehicle and trailer without the permission of the owner and, as a matter of law, no duty was owed by defendant to plaintiffs' decedent to avoid negligently injuring him or causing his death. The motion being overruled, the defendant submitted to the jury the issue of death from the criminal conduct of decedent.

█ Respondents contend that "defendant had not pleaded that Zuber was engaged in a criminal act at the time of his injury," nor that plaintiffs were thereby barred of recovery. While it is true that such fact was not pleaded as a defense by defendant, yet it is also true that plaintiffs' petition did not disclose that Zuber was engaged in the commission of a crime at the time he was injured. If such fact appears at all, it appears from plaintiffs' evidence and, if the facts shown by plaintiffs' evidence defeat, as a matter of law, any recovery by the plaintiffs, then such issue was properly raised by the motion of defendant for a directed verdict.

It is apparent that, if plaintiffs' decedent was in fact actively intermeddling with and engaged in the commission of a crime in connection with defendant's Carry-alls at the time of his injury and death, then the prior opinion of this court determining the question of defendant's liability to an innocent third party, or curious bystander, does not necessarily determine the question of defendant's liability to plaintiffs for said death under the facts of this case and the issue is open for decision at this time.

█ "Actionable negligence consists in the breach or nonperformance of some

duty which the party charged with the negligent act or omission owed to the one suffering loss or damage thereby." Settle v. Baldwin, 355 Mo. 336, 196 S.W.2d 299, 302; 65 C.J.S. Negligence § 2, p. 324. "One applicable general rule of law is that there must be a duty raised by the law and breached by defendant before an action for negligence lies." Kelly v. Benas, 217 Mo. 1, 9, 116 S.W. 557, 559, 20 L.R.A., N.S., 903. If there was no duty owed, none could be breached. Whealen v. St. Louis Soft Ball Ass'n, 356 Mo. 622, 202 S.W.2d 891, 895. The burden rested upon the plaintiffs to show that defendant owed Zuber a duty at the time he was injured and that he was injured by a breach of that duty. Plaintiffs may not maintain an action for the wrongful death of their father, if he could not have maintained an action for damages had he survived. Fitzpatrick v. Kansas City Southern R. Co., 347 Mo. 57, 146 S.W.2d 560, 565; Worth v. St. Louis & S. F. R. Co., 334 Mo. 1025, 69 S.W.2d 672, 674; Section 537.080 RSMo 1949 (since amended Laws 1955, p. 778). Could deceased have maintained an action for damages for personal injuries had he survived?

Section 560.175 RSMo 1949, V.A.M.S., provides: "1. No person shall drive, operate, use or tamper with a motor vehicle or trailer without permission of the owner thereof. 2. No person shall, without the permission of the owner or person in charge thereof, climb upon or into, or swing upon any motor vehicle or trailer, whether the same is in motion or at rest, * * * or attempt to manipulate any of the levers, starting device, brakes, or machinery thereof, or set the machinery in motion * * *."

█ The Euclid Carry-alls in question, consisting of tractors and trailers, were motor vehicles within the meaning of said statute. State v. Ridinger, 364 Mo. 684, 266 S.W.2d 626, 632(5), 42 A.L.R.2d 617; State v. Powell, Mo.Sup., 306 S.W.2d 531, 533; 60 C.J.S. Motor Vehicles § 1, p. 109;

State v. Schwartzmann, 225 Mo.App. 577, 40 S.W.2d 479, 481(8). They were self-propelled vehicles operated by power developed in the tractor portion of the vehicle and they were designed and intended for the purpose of carrying materials. The pleadings refer to them as "diesel or other motor driven earth-moving tractors and trailers" and the evidence supports the description.

Not only does plaintiffs' evidence show that Zuber was operating one of these motor vehicles and was seated upon it when last seen alive, but that only a few minutes later he was found dead under it. The evidence fails to show any permission granted by defendant to either Zuber or Canterbury and plaintiffs proceed herein upon the theory that neither had any permission from the owners to operate or tamper with the machines. While the evidence shows that each of these adults (Zuber was 26 years of age and Canterbury was 23 at the time) operated different machines, plaintiffs have proceeded upon the theory that they were operating the two machines together as a joint or co-operative undertaking. All of the evidence is to the same effect. We have noted the submission in plaintiffs' instruction that "John S. Zuber and James Canterbury were attracted to said place by the presence of said vehicles and undertook to and did operate two of said vehicles; and that while they were so engaged one or the other of said vehicles was caused to come into violent contact with John S. Zuber."

Plaintiffs' evidence showed that on the morning of May 29, 1949, Zuber and another came to Canterbury's house and loaded a boat on Zuber's pick-up truck and took it to the river near Zuber's home. They fished until noon and repaired a net and fished thereafter until about 3:30 P.M. Zuber had shared his half pint of whiskey with Canterbury and others during the morning and they ate fish together at noon. At some time in the afternoon, Canterbury rolled up the trammel net and went over the levee to Zuber's house. At the house he heard one of the "Eucs" start up. He went back over the levee and saw his cousin (Zuber) running one of the "Eucs" in the open field. Canterbury then walked over to the road to a "Euc" and started it. They had seen the "Eucs", two on each side of the street, as they drove to the river to unload the boat. When Zuber brought his "Euc" back to where Canterbury was seated on another "Euc", plaintiffs showed by Canterbury that Zuber said to his cousin that his "Euc" didn't have brakes, but the court struck out the statement, as hearsay at defendant's objection. Plaintiffs then offered to prove the same statement again and that Canterbury "then told him what to do", apparently, to close the pet-cock valve and operate the engine to build up air pressure. (Respondents now say their offer was erroneously excluded.) Canterbury then pulled out, and when he looked back and saw Zuber was not following him, he returned to find Zuber dead. Canterbury also testified that when they finished their conversation he "hollered" and told Zuber he was moving and moved on up the road. An objection was then sustained as to what Canterbury said. As a further indication that respondents concede facts showing cooperation between Zuber and Canterbury in the unlawful tampering with and operation of these machines, respondents argue that, after the conversation between Zuber and Canterbury, "the jury was entitled to draw the reasonable inference that during the half minute Canterbury was testing out his gears decedent, in the exercise of ordinary care for his own safety, got down from his tractor to close the air pressure pet-cock valve or for some other justifiable purpose and was caught between the vehicles by the sudden starting and swerving to the left and jackknifing of the Canterbury machine." While we find no evidence to support respondents' conclusions and claimed inferences as to what Zuber was doing or what happened, it is apparent that respondents

concede the cooperation between the parties in the operation of and tampering with the machines.

As stated, there was no evidence direct or circumstantial that either Canterbury or Zuber had ever operated any of defendant's machines before. There was evidence that Zuber had never been known to have had anything to do with any of the "Eucs" before and had not previously operated any of them. There is no evidence in the record from which an inference can be drawn that either Zuber or Canterbury had the owner's permission to operate or tamper with any of the machines on the occasion in question. Respondents do not contend to the contrary, but argue that the two parties had defendant's "implied consent and invitation to use, handle and operate the machines," because others had operated them. The words used in the statute are "without permission of the owner." Permission means "act of permitting; formal consent; authorization; leave; license or liberty granted." Webster's New International Dictionary, Second Edition. "Implied consent and invitation," as relied on by respondents, does not remove or prevent the application of the provisions of the statute nor can an inference be drawn from the facts in evidence that these two adults, who had not operated these machines before, had any "implied consent and invitation" to operate them on the day in question, nor did these individuals occupy the status of invitees, as contended by respondents. It was still a criminal offense for Zuber and Canterbury to operate the machines, even if the owner by the exercise of ordinary care could have known that others were tampering with these machines and did not post a guard to prevent tampering or operation. Both were adults, trespassers on the machines, and jointly participating in the criminal acts of tampering and operating motor vehicles without the permission of the owner.

Respondents, however, argue that at the time of receiving his fatal injuries Zuber "was not then tampering with a motor vehicle and such alleged criminal act could not have been the proximate cause of his injuries and death." We are not here dealing with proximate cause. The contention that Zuber's criminal conduct had ceased conflicts with plaintiffs' evidence from which it appears that Zuber was last seen standing in or on the tractor of his machine and that he was found dead under it. It further conflicts with the inference which respondents seek to draw from the evidence that he had dismounted from his tractor "to close the air pet-cock valve" (which would be tampering) in accordance with Canterbury's instructions to build up air pressure for the brakes (an inference apparently based on the evidence offered by plaintiffs and excluded by the court). We find no evidence in the record from which an inference can be drawn that Zuber had discontinued or intended to abandon any or all acts constituting a violation of Section 560.175, supra, committed either by himself or in co-operation with Canterbury, prior to sustaining the injuries resulting in his death.

Respondents say that "the abrasions on his (Zuber's) body and the tear and laceration of the diaphragm, laceration of the lower aspect of the right lung, and the traumatic pulpification of his liver clearly showed great pressure such as would come from being squeezed and rolled between the Euclid Carry-alls." They further state that "with no direct evidence in the case that either machine struck Zuber, or that he received his fatal wounds from contact with either machine, plaintiffs, in their main instruction, submitted that Zuber received said injuries by coming into violent contact with one or the other of said machines causing injuries from which he died."

We agree that it is immaterial which machine caused Zuber's death, since it was either the one he was operating or the one his confederate was operating. Unless defendant owed a duty to protect Zuber from harm resulting from his own criminal acts and those of his confederate in the

**736**

enterprise, there was no breach of its duty to him and no liability for negligence to him or to his children and there was no such negligence as was submitted by plaintiffs' instruction. No duty was owed by defendant to either Zuber or Canterbury to protect them against their own criminal acts.

 While it clearly appears from the prior opinion that defendant owed a duty to protect any innocent third parties or curious bystanders, not trespassers, who had a lawful right to be in the proximity of defendant's machines and owed a duty to protect them from injury by the reckless or unskilled operation of the machines by intermeddlers, it would materially extend that doctrine to grant protection and imply such a duty on the part of the defendant to Zuber and Canterbury, whom plaintiffs' evidence shows to have been intermeddlers and active participants in the commission of a crime, to wit, the unlawful operation of and tampering with said machines without the permission of the owner. We need not determine what duty, if any, the defendant owed to Zuber and Canterbury, the active adult intermeddlers who were operating the machines and tampering with them without defendant's permission in violation of the state statute referred to. It is sufficient to say that defendant owed them no such duty that any breach thereof could make defendant guilty of any of the assignments of negligence submitted by plaintiffs in their instruction. See, Levy v. Kansas City, 8 Cir., 168 F. 524, 22 L.R.A.,N.S., 862; Gilmore v. Fuller, 198 Ill. 130, 65 N.E. 84, 60 L.R.A. 286; Castronovo v. Murawsky, 3 Ill.App.2d 168, 120 N.E.2d 871; 1 Am.Jur. 414, Actions, Sec. 16; 52 Am.Jur. 436, Torts, Sec. 92; 60 C.J.S. Motor Vehicles § 401, pp. 1020–1022; 65 C.J.S. Negligence § 24b, p. 440. We must and do hold that defendant owed no duty to Zuber and Canterbury to protect them against their own unlawful and criminal acts, and there is no basis for liability of defendant to the plaintiffs herein. Zuber could not have maintained an action for damages for injuries sustained by reason of his own conduct or that of his confederate, where it owed them no duty of protection. The facts and circumstances relied upon fail to establish that defendant was negligent in the respects submitted, but show that defendant was not guilty of the negligence alleged to have caused Zuber's injuries and death. The court erred in not directing a verdict for defendant.

The judgment is reversed.

All concur.